THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELECTRIC MIRROR, LLC, | Case No. C16-0665-RAJ |
| Plaintiff, | **ORDER** |
| v. | |
| AVALON GLASS AND MIRROR CO. and GLASSWERKS LA, INC., | |
| Defendants. | |

This matter comes before the Court on Defendants' Motions for Partial Summary Judgment. Dkt. ## 37, 103. Plaintiff Electric Mirror, LLC ("Electric Mirror") opposes the Motions. Dkt. ## 73, 111. Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary. For the reasons that follow, the Court **DENIES in part and GRANTS in part** Defendants' first Motion (Dkt. # 37) and **DENIES** Defendants' second Motion (Dkt. # 103).

## I. BACKGROUND

Electric Mirror filed this action against Defendants Avalon Glass and Mirror Co. ("Avalon") and Glasswerks LA, Inc. ("Glasswerks"), alleging breaches of express warranty, breaches of implied warranty, breach of contract, and negligence. Dkt. # 1. Electric Mirror produces high-end mirror products with features such as built-in lighting and television displays. *Id.* at ¶ 6. Electric Mirror purchases glass and mirrors

ORDER - 1

from manufacturers and distributors and then adds lighting, displays, frames, and other features to create the finished product. *Id*. at ¶ 7. Electric Mirror's customers include luxury hotels and resorts, including hotel-casinos in Las Vegas, Nevada. *Id*. at ¶ 6. Avalon manufactures mirror products, which includes mirror painting and fabrication. *Id*. at ¶ 8. Glasswerks is a retailer and distributor of glass and mirrors, and represents itself as a "sister company" to Avalon. *Id*. at ¶ 9. Electric Mirror has been purchasing stock and custom glass and mirror products from Avalon since 2008. *Id*. at ¶13.

In 2012, Electric Mirror made an inquiry to Avalon about "coated or hard coated reflective glass" and "Dia-electric glass". Dkt. # 72 Ex. 2. Avalon suggested MirroView, which "is specifically for your application." *Id*. Avalon also provided Electric Mirror with literature from MirroView's manufacturer, Pilkington North America ("Pilkington"). *Id*. at Ex. 3. These materials describe MirroView as glass for "installation in front of a TV or any flat screen display," with a coating that is "tough and durable." The materials also state that "for most situations the product can be handled, fabricated, installed and maintained in a similar manner as uncoated glass," and that MirroView is "tremendously durable and can be easily handled, transported and processed, including tempering." *Id*. at Exs. 4-6. Suggested applications for MirroView include hotel rooms, bars and restaurants, lobbies, salons, bathrooms, living rooms, and bedrooms. *Id*. at Ex. 5. Between January of 2013 and June of 2014, Electric Mirror purchased more than $120,000 in MirroView from Avalon. Dkt. # 78 at ¶ 6.

In October of 2013, Electric Mirror submitted a quote to MGM Resorts ("MGM") for a remodel of the Mandalay Bay Hotel. Dkt. # 77 Exs. B, C. After reviewing samples of MirroView and an alternative product, Electric Mirror provided MGM with sample mirror products made using three different mirror types, including MirroView, for their consideration. *Id*. at Exs. D, G, H. MGM then requested a quote

from Electric Mirror using MirroView. *Id.* at Ex. I. On or about November 5, 2014, Electric Mirror contracted with MGM Resorts to provide 3,351 mirror products for the Mandalay Bay Hotel in Las Vegas. Dkt. # 72 Ex. 37.

Between January and June 2015, Electric Mirror issued several purchase orders to Avalon for "V20" type mirrors manufactured with MirroView coated glass. *Id.* at ¶ 14; Dkt. # 38 Ex. C. The purchase orders each listed Purchase Order General Terms and Conditions ("Terms and Conditions"). *Id.* On or before January 13, 2015, Randy Steinberg, CEO of Glasswerks, contacted Pilkington about a "MirroView project probably for Electric Mirror. The end use is back painted MirroView with the paint stripped in the area where the TV will sit behind it. The project is a large hotel." Dkt. # 72 Ex. 11. Two days later, Avalon received a purchase order for Electric Mirror marked as the "MGM JOB ACCT". *Id.* at Ex. 12. When Pilkington requested more details about the "end-use project," Avalon informed them that the job was for MGM. *Id.* at Ex. 14. On February 13, 2015, Avalon began shipping its product to Electric Mirror. Dkt. # 38 Ex. D. By May 25, 2015, Avalon had shipped 3,560 mirrors to Electric Mirror. *Id.*

Electric Mirror began creating mirror products to fulfill its contract with MGM. In July of 2015, MGM notified Electric Mirror of several issues with the mirror products being installed at the Mandalay Bay Hotel. This included defects in the frost and glue on the frame or backside of the mirror. Dkt. # 72 Ex. 16. A representative from Electric Mirror travelled to Las Vegas and set up a process for inspecting and repairing every mirror product that had a problem. *Id.* at Ex. 38. At some point after Electric Mirror began inspecting each mirror product, MGM began note that there were scratches on the surface of the mirrors. Electric Mirror began adding lighting to their inspection stations in order to better inspect the products. *Id.* at Ex. 17, 18; Dkt. # 38 Ex. F.

On August 7, 2015, MGM again notified Electric Mirror that they were "experiencing quality issues with the mirrors that have gone through review/inspection." *Id.* at Ex. 18. Electric Mirror sent a representative to Las Vegas to investigate the problem. Dkt. # 38 Ex. F. After the site visit, Electric Mirror created an internal project report. The report indicated that "[t]he single largest issue was minor mirror scratches and then pin holes." Specifically, that the Electric Mirror inspection team was "rejecting approximately 40% of all mirrors based upon front side scratches. Currently estimate more than 500 mirrors with scratches. Many of them are small but occurring often in particular the upper left and right corner of the mirror. Scratching was still noticeable at the hotel site as well." Dkt. # 72 Ex. 20.

From early August through mid-September 2015, Electric Mirror discussed the scratches on the mirrors with Avalon on at least two occasions. *Id.* at Ex. 1. During that time, MGM continued to reject more mirror products and Electric Mirror ordered replacement mirrors. *Id.* at Ex. 22. In September, the majority of MGM's rejections were due to scratches on the mirrors. *Id.* at Ex. 23. On September 10, 2015, a representative from Electric Mirror contacted Avalon regarding defects in the mirrors. Specifically, an issue of "overage paint Fenzi," and "many pin holes taking a lot of labor to fix." *Id.* at Ex. 25. On October 1, 2015, Electric Mirror again emailed Avalon regarding quality issues with the mirrors. Electric Mirror indicated that the issues had been "going on for some time," and included pinholes in the paint, "[p]aint over spray on mirror side," "pointed blemishes," and concluded that "QC has gone down considerably over all." *Id.* at Ex. 26. Electric Mirror continued to raise its concerns with Avalon, stating that "[w]e are still experiencing a significant number of scratches on the face of the mirror upon our inspection," and asking Avalon to discuss reimbursement for the mirrors that were defective. *Id.* at Exs. 27, 28.

In December of 2015, Electric Mirror requested that Avalon change their quality control processes. *Id.* at Ex. 30. Glasswerks notified Electric Mirror that they would "continue to process materials for the Mandalay Bay project with [Electric Mirror's] recommended handling changes." *Id.* at Ex. 31. By the time the MGM project was complete, Electric Mirror had sent 2,392 replacement mirrors to MGM. *Id.* at Ex. 19.

On May 9, 2016, Electric Mirror filed a complaint against Avalon and Glasswerks. Dkt. # 1. Defendants then filed a Motion for Partial Summary Judgment of Electric Mirror's breach of express warranty claims, breach of implied warranty claims, and breach of contract claim. Dkt. # 37. On July 27, 2016, Avalon filed a complaint against Electric Mirror in the Superior Court of California, County of Los Angeles. *See Avalon Glass and Mirror Company v. Electric Mirror, LLC et al.*, 2:16-cv-01913-RAJ. Electric Mirror removed the case to the U.S. District Court of the Central District of California and then filed a motion to transfer the case to this District. *Id.* The motion was granted and after the case was transferred, this Court granted the parties' stipulated motion to consolidate that case with this one. *Id.* On August 2, 2018, Avalon filed a Motion for Partial Summary Judgment of its claims against Electric Mirror for breach of contract, quantum meruit, and account stated, in the consolidated case. Dkt. # 103.

## II. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also, White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. V. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

### III. DISCUSSION

#### a. Motion to Strike

Defendants move to strike expert reports submitted by Electric Mirror in their Response to Defendants' Motion for Summary Judgment because they were not

properly authenticated. Dkt. # 76 at 8. Electric Mirror submitted a surreply to Defendants' Motion to Strike pursuant to Local Rule 7(g). Dkt. # 81. The Court finds that Electric Mirror properly authenticated the reports at issue and established the proper foundation for Dr. McCurdy's qualifications as an expert under Fed. R. Evid. 702. Defendant's Motion to Strike is **DENIED.**

### b. Acceptance of Goods, Notice, and Revocation

Avalon argues that Electric Mirror is precluded from bringing these claims against Avalon because they accepted the alleged non-conforming mirrors and failed to notify Avalon of any breach within a reasonable time after it discovered or should have discovered the breach. *See* RCW 62A.2-607(3). Acceptance of goods by the buyer does not of itself impair any other remedy provided by the statute for nonconformity. RCW 62A.2-607(2). Where goods have been accepted, the buyer must notify the seller of any breach within a reasonable time after he or she discovers or should have discovered the breach. RCW 62A.2-607(3).

Assuming that Electric Mirror accepted the alleged nonconforming mirrors, this acceptance is not sufficient to preclude them from seeking damages for a breach of contract or warranty. It is undisputed that Electric Mirror had a method for inspecting the mirrors it received from Avalon, however, Avalon's argument that the existence of this method establishes a basis for this Court to determine that any nonconforming goods were not timely rejected is unpersuasive. There are questions of fact as to when Electric Mirror discovered the alleged deficiencies in the Avalon mirrors, when Avalon received notice of those deficiencies, and whether Avalon received that notice within a reasonable time after those deficiencies were discovered. This is clearly evident in the Reply, where Avalon notes that it is unclear whether Electric Mirror is alleging that the defects in the mirrors were scratches of the mirrors were of a size that they would have been "seen and rejected by [] general inspection," or that the defects

ORDER - 7

were latent defects described as "fine scratches" that were invisible in "typical warehouse lighting." Dkt. # 73 at 10-11. Electric Mirror notified Avalon on several occasions of issues they were having with the mirrors, but there is a question of fact as to when they knew or should have known of these particular defects. Electric Mirror contends that their understanding of the mirror's defects continued to develop over time, and that they continually notified Avalon of these developments. As there is question of fact as to how the mirrors were defective, it follows that there is a question of fact as to when Electric Mirror discovered what those defects were, when Avalon received notice of those defects and whether that notice was reasonable.

Avalon's argument that Electric Mirror cannot recover damages for mirrors that underwent processing at Electric Mirror's facility is also unpersuasive. Revocation of the acceptance of goods must occur before any "substantial change in condition of the goods which is not caused by their own defects." RCW 62A.2-608(2). This statute does not serve as an appropriate basis on which to grant summary judgment because as a remedy, revocation is not a prerequisite for recovery of damages[1]. To require revocation would be particularly problematic in this case, as Electric Mirror alleges that the mirrors were easily scratched during regular processing and that the scratches caused by the alleged latent defects in the mirrors were invisible in typical warehouse lighting and only visible in a "well-lit bathroom or inspected in similar condition." Dkt. # 73 at 11. Based on the evidence presented at this stage in the proceedings, the Court cannot make a judgment as to the veracity of these claims, however, if the allegations are true, Electric Mirror should not be required to revoke acceptance of the

---

[1] Avalon cites to two Washington State cases in support of their contention that Electric Mirror is barred from recovery where the goods at issue underwent a substantial change prior to revocation. However, one of the cases cited involve questions of strict liability for a design or manufacturing defect that causes physical harm to a consumer and is inapposite. *Padron v. Goodyear Tire & Rubber Co.*, 34 Wash. App. 473, 475, 662 P.2d 67, 69 (1983). The other does not support Avalon's proposition that a buyer must revoke acceptance in order to recover damages. *Butcher v. Garrett-Enumclaw*, 20 Wash. App. 361, 377, 581 P.2d 1352, 1362 (1978).

ORDER - 8

goods in order to make a claim for damages for breach of an express or implied warranty due to latent defects that would not have been discovered until after the goods were altered.

### c. Express and Implied Warranties

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." RCW 62A.2-313(1)(a). "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." RCW 62A.2-313(1)(b). The Terms and Conditions of the purchase orders for the mirrors at issue state:

> . . . Seller warrants that the goods and services furnished will be free from defects in materials and workmanship, merchantable and in full conformity with Buyer's specifications, drawings, and data, and Seller's description promises, or samples, and that such goods will be fit for the Buyer's intended use, provided Seller has reason to know of such use.

Dkt. # 72 Ex. 35. Electric Mirror claims that these Terms and Conditions are express warranties that the mirrors would be free from defects, merchantable, and fit for a particular purpose. Avalon makes no argument that these Terms and Conditions do not constitute express warranties for the goods at issue.

Electric Mirror also claims that Avalon also breached implied warranties that the mirrors would be merchantable and fit for a particular purpose. A warranty that the goods are merchantable is implied in a contract for their sale if the seller is a merchant of goods of that kind. RCW 62A.2-314. The statute defines merchantable as, among other things, goods fit for the ordinary purposes for which such goods are used. *Id.* "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the

seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." RCW 62A.2-315.

Avalon argues that Electric Mirror has not met its burden to establish a breach of contract or warranties, that Electric Mirror cannot show that Avalon knew or should have known that MirroView was unsuitable for use in the MGM project, and that Avalon cannot be held liable for any breach in express warranties in Pilkington's marketing and product specifications because they did not adopt those warranties. First, any argument that this Court should dismiss Electric Mirror's claims because they did not meet their burden of proof in this case is not supported by the evidence. Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 317, 106 S. Ct. 2548, 2550, 91 L. Ed. 2d 265 (1986). As discussed further below, Electric Mirror has made a sufficient showing that there are questions of fact as to whether Avalon breached applicable warranties with respect to the mirrors at issue. Wholesale dismissal of all of Electric Mirror's breach of warranty claims would be inappropriate unless there is an absence of evidence to support their case.

Electric Mirror contends that the express warranties in the Terms and Conditions of the purchase orders incorporate the "description promises" of MirroView in the literature from Pilkington given to them by Avalon in 2012. Pursuant to Washington law, a seller is not liable for the express warranty of a manufacturer unless the seller adopts the warranty when selling the goods to others. *Cochran v. McDonald*, 161 P.2d 305, 306 (1945). It is undisputed that Avalon introduced MirroView to Electric Mirror in 2012, and provided Electric Mirror with

ORDER - 10

Pilkington's marketing and product specifications. However, there are, as with many of the pertinent issues in this case, questions of fact as to whether Avalon adopted this warranty and whether Pilkington's literature was part of the basis of the bargain between Avalon and Electric Mirror. For example, Avalon contends that the evidence shows that Electric Mirror selected MirroView for the Mandalay Bay Hotel project based on its independent observations, investigation, and discussions with MGM. However, it is unclear to what extent, if any, Electric Mirror relied on Pilkington's literature in selecting MirroView as an option for the project. While there is evidence that Avalon indicated that MirroView was "specifically for [Electric Mirror's] application," it is again unclear whether or to what extent Avalon used Pilkington's descriptions of durability and suggested uses to aid in selling MirroView to Electric Mirror. Dkt. # 72 Ex. 2.

Avalon argues that Electric Mirror cannot show that Avalon knew or should have known that MirroView was unsuitable for use in the MGM project. RCW 62A.2-314 defines merchantable as "fit for the ordinary purposes for which such goods are used" or "goods [that are] reasonably fit for their usual, intended purpose." *Fed. Signal Corp. v. Safety Factors, Inc.*, 125 Wash. 2d 413, 427, 886 P.2d 172, 180 (1994). Factors such as usage in the trade and the characteristics of similar goods manufactured by others are considerations when evaluating merchantability. *Id*. Electric Mirror claims that the mirrors provided by Avalon breach both express and implied warranties of merchantability and fitness for a particular purpose.

Electric Mirror argues that in this case, merchantable means mirrors that would be acceptable to those who purchase mirrors for luxury resorts. Dkt. # 73 at 14-15. More specifically, Electric Mirror argues that whether the mirrors were merchantable should be judged based on their acceptability to the purchaser, or in this case, MGM. The Court disagrees. Electric Mirror argues that the alleged defects were not visible

under certain lighting. The mirrors at issue were not acceptable to MGM for use in well-lit bathrooms in the Mandalay Bay Hotel. MirroView mirrors are advertised as "Digital Display Mirrors" that conceal digital displays and video screens for commercial and residential applications. Dkt. # 72 Ex. 6. Electric Mirror's contention that the "usual, intended purpose" of these mirrors is production of "high end mirrors for a resort hotel in Las Vegas," is highly specific and not supported by the evidence. While hotel rooms and bathrooms are suggested applications, Pilkington's literature also suggests that MirroView can be used in living rooms, retail shops, lobbies and salons, and bars and restaurants; all locations that may not necessarily have the same bright, lighting. *Id.* Therefore, if the defect is as alleged, it is possible that these mirrors would be acceptable when used in different applications. Electric Mirror's CEO also observed that MGM's expectations were much higher than those of glass industry standards and Electric Mirror's own internal standards. This directly contradicts their assertion that the mirrors at issue were not fit for typical usage in the trade, or not merchantable. As Electric Mirror fails to make a showing sufficient to establish that the mirrors were not merchantable, the Motion is **GRANTED** as to their claims that Avalon breached both implied and express warranties of merchantability.

Electric Mirror also contends that Avalon knew the particular purpose for these mirrors, and that their failure to provide goods fit for their intended use is also a breach of both implied and express warranties. The evidence shows that Avalon was aware that Electric Mirror was purchasing MirroView for use for MGM in a large hotel in Las Vegas. Dkt. # 72 Exs. 11-14. Avalon argues that regardless of this knowledge, they should not be liable because they did not know or should not have known that MirroView glass was unsuitable for this particular purpose for several reasons: Electric Mirror had never reported a problem with MirroView mirrors in the past,

Electric Mirror selected Mirroview for the MGM project without input from Avalon, and Avalon could not have known that MGM had such rigorous standards.

The Terms and Conditions in the purchase orders state that the goods furnished by the Seller will be fit for the Buyer's intended use, provided Seller has reason to know of such use. Avalon knew that Electric Mirror intended to use the MirroView mirrors for the MGM project. The Terms and Conditions do not state that the Seller, or Avalon, cannot be held liable if they did not know and should not have known that the goods were not fit for the Buyer's intended use. Avalon provides no legal authority and does not point to any evidence that such knowledge is a prerequisite for liability for breach of this type of express warranty.

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." RCW 62A.2-315. Between January of 2013 and June of 2014, Electric Mirror purchased more than $120,000 in MirroView from Avalon. Dkt. # 78 at ¶ 6. Electric Mirror deemed it suitable for consideration when submitting a quote for the MGM project. Dkt. # 77 Exs. D, G, H. However, as noted above, there is a question of fact as to how much Electric Mirror relied on past representations made by Avalon in selecting MirroView for the project. Further, there are questions of fact as to whether Electric Mirror relied on Avalon's skill or judgment in furnishing goods suitable for use in the creation of mirror products for installation at the Mandalay Bay Hotel. Therefore, Avalon's Motion is **DENIED** as to Electric Mirror's breach of contract claim and Electric Mirror's remaining breach of express and implied warranty claims.

### d. Dismissal of Glasswerks

Defendants move that the Court dismiss Glasswerks from this lawsuit due to lack of privity of contract between Electric Mirror and Glasswerks. Electric Mirror alleges that Glasswerks and Avalon acted in concert and dealt with Electric Mirror as one entity, and as such, Avalon is an alter ego of Glasswerks because of its "total control over Avalon." Dkt. # 1 at ¶10; Dkt. # 72 at 2. Under Washington law, a court is justified in piercing the corporate veil and finding a corporate entity is one and the same with another corporate entity when the corporate form has been intentionally used to violate or evade a duty, and where one entity "so dominates and controls [the other entity" that it is that entity's alter ego. *Rapid Settlements, Ltd.'s Application for Approval of Transfer of Structured Settlement Payment Rights*, 166 Wash. App. 683, 692, 271 P.3d 925, 930 (2012). Electric Mirror fails to show how the corporate relationship between Avalon and Glasswerks was used violate or evade a duty. "Typically, the injustice which dictates a piercing of the corporate veil is one involving fraud, misrepresentation, or some form of manipulation to the entity's benefit and the creditor's detriment." *Id*. (quoting *Truckweld Equip. Co., Inc. v. Olson*, 26 Wash.App. 638, 644–45, 618 P.2d 1017 (1980)). Electric Mirror does not argue that that the corporate form was used to defraud or was manipulated in any way to their detriment. Defendants' motion for summary judgment of all claims against Glasswerks is **GRANTED.**

### e. Motion for Partial Summary Judgment of Consolidated Claims

Avalon also filed a Motion for Partial Summary Judgment of their claims against Electric Mirror for breach of contract, quantum meruit, and account stated, in the consolidated case. Dkt. # 103. Electric Mirror's Answer in the consolidated case asserts the affirmative defense of setoff. "The right of setoff allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the

absurdity of making A pay B when B owes A. The defining characteristic of setoff is that the mutual debt and claim are generally those arising from different transactions." *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996) (internal citations and quotations omitted).

The parties do not dispute that there are several transactions involved in the consolidated case, however, Avalon argues that Electric Mirror's setoff defense is a disguised claim for recoupment. "[R]ecoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *Id.* at 1399 (internal citations and quotations omitted). Under Washington law, the buyer must notify the seller of his intention to deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract. RCW 62A.2-717.

Avalon contends that the individual transactions at issue are the "same transaction" for purposes of the recoupment doctrine under the "logical relationship test." Under the "logical relationship test", a transaction "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). While at least two of the 115 purchase orders included mirrors ordered for both the MGM project and other projects, this does not create a connection immediate enough to show a logical relationship between the transactions in both cases. Avalon also notes that the goods identified in the purchase orders were ordered during the same period of time that Electric Mirror was also ordering mirrors for the MGM project. Dkt. # 133 at 4. These two factors are not sufficient to establish that this Court should classify the transactions at issue in both cases as the "same transaction."

ORDER - 15

As Electric Mirror is asserting the defense of setoff, the Court declines to decide Avalon's claims until Electric Mirror's claims have been adjudicated. Avalon's Motion for Partial Summary Judgment is **DENIED.** Dkt. # 103.

## IV. CONCLUSION

For all the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment of Electric Mirror's breach of express and implied warranties of merchantability claims, and **DENIES** Defendants' motion for summary judgment of the remaining breach of contract, breach of express warranty, and breach of implied warranty claims. Dkt. # 37. Defendants' motion for summary judgment of Electric Mirror's claims against Glasswerks is **GRANTED** and Glasswerks is dismissed as a Defendant in this case. Defendants' motion for summary judgment of their claims against Electric Mirror in the consolidated case is **DENIED.** Dkt. # 103.

Dated this 19th day of September, 2018.

The Honorable Richard A. Jones
United States District Judge