THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ELECTRIC MIRROR, LLC, a Washington limited liability company,

                Plaintiff,

    v.

AVALON GLASS AND MIRROR CO., a California corporation, and GLASSWERKS LA, INC., a California corporation,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:16-cv-00665-RAJ

**DEFENDANT AND CONSOLIDATED PLAINTIFF AVALON GLASS & MIRROR CO.'S TRIAL BRIEF**

**APPENDIX OF FACTS AND EXHIBITS**

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

I.  **INTRODUCTION**

This case arises from the sale of front-coated glass to make lighted mirrors.  Non-party Pilkington North America ("Pilkington") manufacturers this specific glass product, MirroView, which Avalon Glass & Mirror Co. ("Avalon") distributed to its customer, Electric Mirror, LLC. Electric Mirror used the MirroView to construct its core product—Lighted Mirrors—for the bathrooms in the renovation of MGM's Mandalay Bay Hotel and Resort in Las Vegas.  Electric Mirror selected MirroView for the Mandalay Bay project without any consultation with Avalon.

Avalon submits this Trial Brief setting forth the reasons the Court should (a) dismiss the warranty, contract, and negligence claims asserted by Electric Mirror and (b) enter judgment for Avalon on its consolidated claims arising from Electric Mirror's failure to pay $245,639.27 on undisputed invoices.  This Trial Brief is supported by an attached Appendix of Facts and Exhibits. The key facts and legal principles are summarized below.

1.     **No Reliance**.  Avalon did not participate in selecting MirroView for the Mandalay Bay project.  As of January 15, 2015, when Electric Mirror ordered 2,885 units of MirroView to begin building the Lighted Mirrors for the Mandalay Bay, Electric Mirror had already been using MirroView for nearly two years to build Lighted Mirrors for other customers. Electric Mirror cannot prove it relied on Avalon's skill and judgment in selecting MirroView for the Mandalay Bay project.  Under RCW 62A.2-315, the Court should dismiss Electric Mirror's claim for a breach of express or implied warranties that MirroView was fit for Electric Mirror's intended use.

2.     **No Materials Defects**.  After inspecting and accepting the MirroView, Electric Mirror subjected it to extensive processing to construct the Lighted Mirrors it delivered to MGM. These substantial changes to the MirroView prevent Electric Mirror from proving that alleged front-surface scratches were attributable to Avalon.  RCW 62A.2-608(2).  In addition, Electric Mirror did not notify Avalon of any alleged quality concerns with the first 3,332 Lighted Mirrors built and shipped to Las Vegas between February and early-July, 2015.  Nor did Electric Mirror give reasonable notice of any alleged defects in the new Lighted Mirrors built from August to

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 1
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

November, 2015.  Instead, Electric Mirror just continued ordering more glass, undertaking an entire rebuild of the Mandalay Bay project based on a heightened quality criteria that exceeded industry standard.  In short, there was no notification within a reasonable time of discovering the purported breach.  RCW 62A.2-607(3).  Electric Mirror is thus "barred from any remedy."  *Id.*; RCW 62A.2-714(1).

3.      **Real Reasons for Rejection of Lighted Mirrors**.  Electric Mirror blames "micro scratches" for MGM's rejection of 2,392 fully-finished Lighted Mirrors.  This is baseless.  MGM rejected the Lighted Mirrors due to broken, warped, and scratched frames; rear-surface damage to frosted areas caused by sandblasting; jagged and poorly plotted cutouts for lights and television screens; and other failures of workmanship that had nothing to do with Avalon or MirroView.

4.      **No Design Defect**.  Electric Mirror attempts to side-step its inspection, acceptance, processing, and substantial changes to the MirroView by alleging a "latent defect" in the goods.  Specifically, Electric Mirror alleges that MirroView, as a product, cannot be processed like ordinary glass without experiencing significant scratching.  In reality, Electric Mirror is now attempting to assert what amounts to a disguised *design* defect claim against the product distributor (Avalon), who did not manufacture the glass or warrant against design defects.

5.      **Scratches are Not Latent Defects**.  Notwithstanding that Avalon did not warrant against alleged design defects, front-surface mirror scratches are not latent defects.  Electric Mirror can, and does, inspect certain types of mirrors to what it calls a "perfection" standard where any blemish or imperfection requires rejection, *e.g.*, medicine cabinet mirrors.  In other words, Electric Mirror can, and regularly does, inspect mirrors for flaws like "micro" scratches.  While Electric Mirror admits that MirroView is not intended to satisfy such a heightened quality criteria (as industry standards state otherwise), it cannot state that minor blemishes outside of the industry standard are incapable of being reasonably detected.  Defects that can be identified through reasonable inspections cannot be treated as latent defects.

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 2
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

6.     **No Adopted Warranties**.  In the two years before the Mandalay Bay project, Electric Mirror requested copies of the MirroView promotional sheet and product specifications, both of which are published by Pilkington and generally available online.  By passing along this information, Avalon, as a dealer of MirroView, did not adopt any express or implied warranties allegedly made by Pilkington.

7.     **Unsupported and Speculative Damages**.  Even if Avalon were liable in part for the rebuild of Lighted Mirrors (which Avalon denies), Electric Mirror has not discounted or apportioned any amount of its incidental damages attributable to its own actions.  Electric Mirror seeks to recoup 100% of its alleged rebuild costs while blithely ignoring that *thousands* of Lighted Mirrors were rejected for broken and misaligned frames, frost defects, failed electrical parts, and handling damage.  In addition, Electric Mirror seeks more than $4,000,000 in lost profits without identifying a single lost customer or addressing international supply problems and concurrent "rebuilds" of defective Lighted Mirrors it shipped to projects in Chicago and San Francisco.  Electric Mirror's damages are unsupported, speculative, and implausible.  In sum, Electric Mirror fails to establish that its alleged damages were proximately caused by Avalon.

8.     **Unpaid Invoices**.  On January 26, 2016, Electric Mirror decided to withhold hundreds of thousands of dollars in unpaid invoices unrelated to the Mandalay Bay project "as leverage."  Consistent with its intentions, Electric Mirror admits that it withheld $245,639.27 in payment on invoices between December 9, 2015 and April 12, 2016 that were unrelated to the Mandalay Bay project (the "Unpaid Invoices").  The Unpaid Invoices have been accruing finance charges of 1.5% per month, compounding monthly, such that the amount due as of November 29, 2018 will be $142,704.62.  Avalon is entitled to recover all reasonable costs incurred to collect on the Unpaid Invoices, including its attorney's fees and costs.

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 3
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

## II. <u>CASE OVERVIEW</u>

1.    From February to July, 2015, Electric Mirror built 3,332 Lighted Mirrors for the renovation of the MGM Mandalay Bay Hotel & Resort.  Each Lighted Mirror included a front-coated mirror, aluminum frame, metal hangers (attached with glue), electrical components (lights, ballast, and television screens for a small number of units), and a chassis for attaching the Lighted Mirror to the bathroom wall.  Below is an image of a Lighted Mirror.



2.    Electric Mirror produced each Lighted Mirror by first conducting an incoming quality and acceptance inspection of pyrolytic glass supplied by Avalon—Electric Mirror's glass and mirror distributor.  After accepting the glass, Electric Mirror put it through substantial processing and modification to create the lighting effects, including: (a) applying a vinyl safety backing; (b) plotting the vinyl for removal of the area where the light band—and, in some instances, televisions—would appear; (c) laser cutting the vinyl to expose the rear surface; (d) sandblasting the exposed areas to create the frosting effect; (e) washing; and (e) assembling the electronic components, frame, and hangers.

3.    Every Lighted Mirror received a final quality inspection before being shipped by truck to Las Vegas, NV.  Each Lighted Mirror received Electric Mirror's stamp of approval—a sticker of Bible scripture on the rear side of the Lighted Mirror.  But after arriving in Las Vegas, the Lighted Mirrors sat in wooden crates in MGM's warehouse for several weeks, where

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 4
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

temperatures exceeded 120 degrees.  Electric Mirror did not design the Lighted Mirrors for such conditions.

4.      MGM installed the first two floors of Lighted Mirrors in late June and early July, 2015.  The Lighted Mirrors were a disaster.  The heat in the warehouse had melted the glue, which loosened and misaligned the hangers.  The high temperatures had warped the aluminum frames.  MGM complained that the mirrors were covered in saw dust (from the wooden crates) and metal shavings from last-minute efforts to file the frame edges.  The Lighted Mirrors were covered with dirty finger prints, tape residue, and scratches on the exterior frames.  MGM halted the installation process and looked to Electric Mirror for answers.  *The date was July 6, 2015*.

5.      Six months earlier, on January 14, 2015, Electric Mirror issued a purchase order to Avalon for 2,885 pieces of pre-cut, back-painted "MirroView."  MirroView is manufactured in Laurinburg, NC, by Pilkington—one of the world's largest manufacturers of glass and glazing products. MirroView can be used to create a vanishing effect for lights and television screens that are concealed behind the reflective surface.  When the lights or television are turned on, they are visible; when they are turned off, they vanish.  Over the next four months, from February to May, 2015, Electric Mirror issued four more purchase orders for an additional 1,052 pieces of MirroView, bringing the total number of units to 3,937.  *Electric Mirror did not reject a single piece of MirroView supplied by Avalon between February and May, 2015.*

6.      Avalon was not Electric Mirror's first choice for supplying MirroView for the Mandalay Bay project.  Initially, Electric Mirror sought to purchase MirroView directly from the manufacturer (Pilkington), but could not commit to buying the mirrors by the 22-ton truckload, which Pilkington required.  Electric Mirror needed to go through a distributor, like Avalon.  Electric Mirror had never discussed the Mandalay Bay project with Avalon during the preceding year (2014) when Electric Mirror was bidding for the contract, experimenting with different mirror types, and building sample "model room" Lighted Mirrors for review by MGM.

7.      By the time of the Mandalay Bay project, Electric Mirror was an experienced user of MirroView.  From January 2013 to July 2014, Electric Mirror purchased more than *$151,000*

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 5
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

in MirroView from Avalon to fabricate Lighted Mirrors for other customers.

8.     On July 6, 2015, when MGM shut down the installation of the Lighted Mirrors, Electric Mirror went into crisis mode.  MGM required that all Lighted Mirrors be inspected by its electrical subcontractor, Bombard, before being delivered to the Mandalay Bay.  Electric Mirror set up an inspection and repair operation in a rented warehouse in Las Vegas, referred to as the Advantage Warehouse.  Over the next several months, Bombard rejected over 2,000 fully finished Lighted Mirrors.  Each Lighted Mirror rejected by Bombard had previously passed several quality inspections conducted by Electric Mirror.

9.     On August 7, 2015, Electric Mirror began ordering MirroView from Avalon for rebuilding and replacing 2,392 Lighted Mirrors for the Mandalay Bay.  Electric Mirror did not disclose to Avalon why it was purchasing more MirroView, nor did Electric Mirror ask that the new orders be credited as replacement for prior shipments.  Inexplicably, Electric Mirror did not disclose to Avalon that it (Electric Mirror) was now being held to a "perfection" standard by MGM, meaning that MGM prohibited minor blemishes or imperfections that would otherwise be acceptable under industry standards.  Pursuant to a sequence of purchase orders, Avalon supplied Electric Mirror with thousands of additional pieces of MirroView before Electric Mirror ever disclosed MGM's heightened expectations.

10.     From August to mid-December, 2015, Avalon produced the additional MirroView as ordered.  During this period, Electric Mirror was only one of several dozen customers for whom Avalon was supplying glass and mirror products.  On average, Avalon was producing 700,000 square feet of mirror *per month* during the same time it was supplying MirroView to Electric Mirror.  None of Avalon's other customers complained of defective goods.

11.     Electric Mirror did not charge MGM for any of the cost for rebuilding and shipping the new Lighted Mirrors.  Rather, beginning in late October and continuing into November 2015, Electric Mirror started looking for someone else to blame.  On November 20, 2015, Electric Mirror first claimed to Avalon that it was entitled to some unspecified amount of credit for allegedly defective goods.  Internally, however, Electric Mirror was struggling with a

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 6
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

lack of records showing when and how the mirrors had been damaged.  Electric Mirror had few, if any, photographs of glass *received* from Avalon in an allegedly defective condition.  Also, Electric Mirror could not—and still cannot—prove it rejected incoming glass per industry standards rather than "*for insignificant issues hardly visible to the human eye*," as MGM was doing to Electric Mirror.

12.     Throughout December 2015 and January 2016, Avalon cooperated with Electric Mirror in investigating why the Mandalay Bay project had been such a disaster.  Representatives from Electric Mirror visited Avalon and proposed a handful of increased quality procedures.  These enhancements were not necessary to produce glass that meets industry quality standards, but Avalon agreed to implement the enhanced quality precautions as a business relationship courtesy.  By that point in time, Electric Mirror had already completed 90–95% of the rebuild of Lighted Mirrors for the Mandalay Bay.

13.     Throughout the rebuild process for the Mandalay Bay project, Electric Mirror continued to purchase mirrors from Avalon for other projects.  Electric Mirror has not claimed that any of these goods were defective.  Notably, Avalon processes all mirror products in essentially the same manner with the same machinery.  On January 26, 2016, Electric Mirror decided to withhold hundreds of thousands of dollars in unpaid invoices unrelated to the Mandalay Bay project "as leverage."  Electric Mirror admits it withheld $245,639.27 in payment on invoices unrelated to the Mandalay Bay project (the "Unpaid Invoices"), which were issued between December 9, 2015 and April 12, 2016.

### III.  ELECTRIC MIRROR'S CLAIMS SHOULD BE DISMISSED

14.     At trial, Electric Mirror is asserting two discrete warranty claims, a duplicative breach of contract claim, and an illusory claim for negligence.  Specifically, Electric Mirror asserts that Avalon breached an express warranty (set forth in the purchase orders) that the MirroView would be free from defects in "materials and workmanship."  In addition, Electric Mirror claims that Avalon breached express and implied warranties that the MirroView was "fit for a particular purpose."  The duplicate and redundant breach of contract claim is based on the

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 7
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

same facts as the above described breach of warranty claims.  As for the negligence claim, Electric Mirror asserts that Avalon was negligent in handling the MirroView it "manufactured" for Electric Mirror.  For the reasons outlined below, each claim should be dismissed in its entirety.

**A.     Avalon Did Not Breach an Express Warranty Against Supplying Defective Goods.**

15.     Electric Mirror alleges Avalon breached an express warranty in Electric Mirror's purchase orders that Avalon's product would be free from defects in materials and workmanship. The purchase orders state that Avalon warrants that "the goods and services furnished will be *free from defects in materials and workmanship*, merchantable and in full conformity with Buyer's specifications, drawings, and data, and [Avalon's] descriptions, promises, or samples, and that such goods will be fit for the Buyer's intended use, provided [Avalon] has reason to know such use . . . ."  (Emphasis added.)  Avalon's obligations to Electric Mirror are limited by the express language of that warranty.    This claim should be dismissed for several reasons.

**1.     No Liability for Partially or Fully Processed Lighted Mirrors.**

16.     Electric Mirror cannot prove alleged "materials and workmanship" defects for MirroView that was processed in part or to the completion of a Lighted Mirror.  To build a Lighted Mirror, Electric Mirror subjected both the front and rear surfaces of the MirroView to extensive manual handling, machine contact, and modification through sandblasting.  These processes caused a substantial change to the condition of the MirroView that makes it impossible to determine with any certainty that the scratching originated with Avalon.  *See* RCW 62A.2-608(2); *see also Padron v. Goodyear Tire & Rubber Co.*, 662 P.2d 67, 69 (Wash. Ct. App. 1983) ("[T]he plaintiff may be barred from recovery if the product underwent a substantial change in its condition after leaving the manufacturer."); *Butcher v. Garrett-Enumclaw*, 581 P.2d, 1352, 1362 (Wash. Ct. App. 1978).  But Electric Mirror's problems go further than the mere uncertainty of how a "scratch" may have occurred.  The evidence is overwhelming that Electric Mirror's *own* processing of the MirroView (through sandblasting, the removal of vinyl with razor blades, and other abrasive handling) caused the overwhelming majority of "scratches" that led to the rejection

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 8
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

of Lighted Mirrors.  Electric Mirror's own expert has confirmed through deposition testimony that when the Lighted Mirrors are illuminated, rear-surface damage and scratching is visible no differently than a front-surface scratch.

17.     Even if it were otherwise, Electric Mirror did not provide notice of the alleged defect within a reasonable time.  This bars all recovery.  RCW 62A.2-607(3).  "Reasonable time, where no time limit is fixed by an agreement, depends on the nature, purpose, and circumstances of such action." *Jarstad v. Tacoma Outdoor Recreation, Inc.*, 519 P.2d 278, 283 (Wash. Ct. App. 1974).  What constitutes a reasonable time is typically a mixed question of law and fact for the trier of fact to decide. *Jeffries v. Clark's Rest. Enters., Inc.*, 580 P.2d 1103, 1105 (Wash. Ct. App. 1978).  The standards governing the timing of the required notice are stricter for commercial buyers like Electric Mirror than they are for retail customers. *See* RCW 62A.2-607 cmt. 4.  Here, there is no convincing evidence or argument that Electric Mirror notified Avalon of any alleged defect within a reasonable time of discovering it.  MGM halted the Lighted Mirror installation project on July 6, 2015, after the disastrous first build.  One month later, Electric Mirror ordered more MirroView from Avalon, but did not say why.  It was not until November 20, 2015, four-and-a-half months after the hotel had halted the installation, that Electric Mirror first told Avalon it was entitled to an amorphous, unspecified credit for allegedly defective product.  Had Electric Mirror told Avalon that there were defects in the MirroView when it ordered more product, Avalon would have had the opportunity to take steps to cure any alleged defect—the very purpose of the notice requirement.  Instead, Electric Mirror sat on its hands while it accumulated alleged damages.  The Court should bar recovery here. *Cf. Armco Steel Corp. v. Isaacson Structural Steel*, 611 P.2d 507, 515 (Alaska 1980) (ruling that eight-month delay in notice was unreasonable under essentially identical UCC provision).  This same principle bars recovery on Electric Mirror's fitness for a particular purpose or use warranty claim.

### 2.     No Liability for "Bad Out of the Box" MirroView.

18.     Electric Mirror points to a small subset of MirroView (335 pieces out of 7,143 total pieces purchased) and claims that the MirroView was scratched on delivery.  Electric Mirror

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 9
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

refers to these units as "Bad Out of the Box" or BoB.  Electric Mirror has the burden of proving on a *per mirror* basis that the unit failed to meet the industry standard, but it has no proof (either through documentation or testimony) of what standard was actually applied.  Electric Mirror openly admits that it was forced by MGM to discard Lighted Mirrors that met the industry standard but fell short of MGM's demand for "perfection."  There is every indication that Electric Mirror imposed the same heightened but entirely inappropriate standard on Avalon.  Under these circumstances, Electric Mirror must be held to its proof and the industry standard for each unit of glass that it claims to have rejected as "bad out of the box."

### 3.    No Liability for Alleged Latent Defects.

19.    Electric Mirror also alleges it could not timely reject the MirroView supplied by Avalon because the goods suffer from a "latent defect" that could not be discovered until the Lighted Mirrors were delivered to Las Vegas.  Specifically, Electric Mirror opines that MirroView has poorer scratch resistance and produces wider scratches than standard silvered mirrors when processed in the ordinary course.  These scratches, Electric Mirror claims, could only be discovered in the unique lighting of the hotel bathrooms at the Mandalay Bay hotel.  The argument fails for numerous reasons, not the least being that no customer of Pilkington or Avalon has ever made such a claim.

20.    Ultimately, Electric Mirror is now attempting to assert what amounts to a disguised claim for defective *design*, not defective materials and workmanship.  "A design defect . . . exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective[.]"  *Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013) (citing *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002)).  Design defects are distinct from manufacturing materials defects, and the former cannot be substituted for the latter.  *See*, *e.g.*, *Bruce Martin Constr., Inc. v. CTB, Inc.*, 735 F.3d 750 (8th Cir. 2013) (affirming summary judgment because flimsy sweeps in grain loader constituted a design defect and design defects were not covered by warranty against defects in material and workmanship); *Voelker v. Porsche Cars N.A., Inc.*, 353 F.3d 516, 527 (7th Cir. 2003) ("[Plaintiff] points to no

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 10
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

part of the record showing that a warranty against defective design was part of his contract with any defendant."). Numerous other courts have also concluded that a design defect is outside the scope of a warranty against defects in material and workmanship.[1] Here, Avalon gave no express or implied warranties against defective design. Electric Mirror cannot rely on evidence of defective design to satisfy its burden on the express warranty claim.

21. Even though Electric Mirror characterizes the purported surface-level "scratches" as a latent defect, the claim still fails. A latent defect is "one which could not have been discovered by inspection." *Rottinghaus v. Howell*, 666 P.2d 899, 905 (Wash. Ct. App. 1983) (citing *Arrow Transp. Co. v. A.O. Smith Co.*, 454 P.2d 387, 391 (Wash. 1969)); *see also McGinn v. N. Coast Stevedoring Co.*, 270 P. 113, 119 (Wash. 1928) ("[A] latent defect is a concealed or hidden defect or imperfection not discernible by reasonable examination such as the nature of the business reasonably permits."). Electric Mirror concedes that it was able to detect "scratches" on MirroView through a reasonable examination of the product, using industry standards—that is the basis of its claim that certain units of MirroView were rejected as "bad out of the box." Moreover, Electric Mirror's expert has already testified that "scratches" on MirroView are easier to detect than scratches on silvered mirrors due to the "reflectance sensitivity to minor layer erosions." Electric Mirror *could* detect purported "unacceptable" front-surface micro "scratches" if it opted to inspect the surfaces to ensure conformance to a standard that far exceeded any recognized by the industry. That Electric Mirror voluntarily elected to deviate from the industry standard to comply with MGM's demand for "perfection" does not transform an otherwise visible micro scratch into a "latent defect."

---

[1] *See*, *e.g.*, *Gertz v. Toyota Motor Corp.*, 2011 WL 3681647, at *3 (C.D. Cal. Aug. 22, 2011) (*citing Tait v. BSH Home Appliances Corp.*, 2011 WL 1832941, at *3 (C.D. Cal. May 12, 2011)); *Hughes v. Panasonic Consumer Elects. Co.*, 2011 WL 2976839, at *19 (D.N.J. July 21, 2011); *Cali v. Chrysler Group, LLC*, 2011 WL 383952, at *2 (S.D.N.Y. Jan. 11, 2011); *Barden v. Hurd Millwork Co., Inc.*, 2009 WL 3740619, at *1 (E.D. Wis. Nov. 9, 2009); *Contino v. BMW of N. Am., LLC*, 2008 WL 2940515, a *4 (D.N.J. July 29, 2008); *Virtual Physical Center Rockville, LLC v. Phillips Medical Systems N. Am., Inc.*, 478 F. Supp. 2d 840, 850–51 (D. Md. 2007); *Brothers v. Hewlett-Packard Co.*, 2007 WL 485979, at *4 (N.D. Cal. Feb. 12, 2007); *Cambridge Eng'g, Inc. v. Robertshaw Controls Co.*, 966 F. Supp. 1509, 1524 (E.D. Mo. 1997).

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 11
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

**B.      Avalon Did Not Breach an Express or Implied Warranty of Fitness for a Particular Purpose.**

22.      Electric Mirror claims that Avalon breached express and implied warranties of fitness for a particular purpose or intended use.  These claims should be dismissed unless Electric Mirror proves by a preponderance of the evidence that (1) Avalon, when it accepted Electric Mirror's purchase orders, had reason to know the particular purpose for which the mirrors were being purchased, and (2) that Electric Mirror relied upon Avalon's skill or judgment in selecting or furnishing suitable goods for that purpose.  *Lewis & Sims, Inc. v. Key Indus., Inc.*, 557 P.2d 1318, 1321 (Wash. Ct. App. 1976) (citing *Ringstad v. I. Magnin & Co.*, 239 P.2d 848, 850 (Wash. 1952); *Burnett v. Hunt*, 486 P.2d 1129, 1134 (Wash. Ct. App. 1971).   In contrast to other commercial warranties, it is imperative to the proof of a warranty of fitness for a particular purpose claim that Electric Mirror actually relied on Avalon's skill or judgment in selecting the appropriate goods.  *Lewis & Sims*, 557 P.2d at 1321.   Electric Mirror must prove that, in so relying, it was ignorant of the fitness of the mirrors "offered" by Avalon and thus relied on the superior skill, information or judgment Avalon possesses, and not its own judgment.  *Id*.; see also *H.B. Fuller Co. v. Kinetic Systems, Inc.*, 932 F.2d 681, 689-90 (7th Cir. 1991) (refusing to recognize the applicability of an implied warranty of fitness for a particular purpose where the buyer failed to establish that the seller had superior knowledge upon which the buyer relied).

23.      Electric Mirror placed its first purchase order for MirroView to be used on the Mandalay Bay project on January 15, 2015, but did not disclose the intended use.  The most Avalon knew was that Electric Mirror was participating in a "large production job" that involved one of the many MGM properties.  Avalon did not know the make or model of mirror that would be fabricated or where in the undisclosed MGM property the Lighted Mirrors would be displayed.  For purposes of warranty claims based on "fitness for a particular purpose," Avalon's general awareness that Electric Mirror would be fabricating Lighted Mirrors for a hotel is not sufficient.  *See, e.g.*, *World Wide Lease, Inc. v. Grobschmit*, 21 Wn. App. 537, 541, 586 P.2d 889 (1978) ("the seller must have reason to know that the buyer is relying on the seller's skill or judgment to

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 12
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

furnish appropriate goods"); *Dobias v. Western Farmers Assoc.*, 6 Wn. App. 194, 199, 491 P.2d 1346 (1971) ("First, a buyer must make known to the seller expressly or by implication the particular purpose for which the article is required, and secondly, the buyer must rely on the seller's skill and judgment when he purchased the article.").

24.     Electric Mirror must also prove it relied upon Avalon's skill or judgment in selecting MirroView for the Mandalay Bay project.  It did not.  Electric Mirror purchased more than $150,000 of MirroView from January 2013 to July 2014 for applications that Electric Mirror did not share with Avalon.  During this period, Electric Mirror never solicited Avalon's guidance on processing, fabricating, handling, or cleaning Lighted Mirrors made with MirroView.  When Electric Mirror decided to bid on the Model Rooms for the Mandalay Bay project, there was no disclosure or consultation with Avalon.  When the Lighted Mirrors for the Model Rooms needed to be replaced due to Electric Mirror's rushed and careless assembly, Electric Mirror *still* did not inform Avalon.  In November and December 2014, Avalon played no role in the decision by MGM and Electric Mirror to build the Lighted Mirrors with MirroView.  Finally, Electric Mirror specifically tried to avoid sourcing the MirroView through Avalon by purchasing directly from the manufacturer, Pilkington.  Based on this evidence, Electric Mirror cannot prove it relied on Avalon's superior skill, information or judgment rather than its own judgment.

**C.     Electric Mirror Is Barred from Recovering Under a Theory of Negligence.**

25.     Electric Mirror asserts Avalon was negligent in handling the MirroView it "manufactured" for Electric Mirror.  The claim should be dismissed as a matter of law.  First, as Electric Mirror knows, Pilkington is the manufacturer of MirroView, not Avalon.  Second, the independent duty doctrine precludes recovery in tort when the plaintiff has an available contract remedy, unless a tort duty arises independently of the terms of the contract.  *See Eastwood v. Horse Harbor Found.*, 241 P.3d 1256, 1264, 1268 (Wash. 2010) (holding that a loss is a contract loss if the injury suffered is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain.). The independent duty doctrine has been applied by the Washington courts "to limit tort remedies in the context of product liability where the

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 13
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

damage is to the product sold . . . ." *Id.* at 1275 (Chambers, J., concurring).  Here, Avalon did not act in any capacity towards Electric Mirror that could create an independent duty against supplying allegedly defective goods.  Electric Mirror's negligence claim should be dismissed.

**D.     Avalon Did Not Adopt Any Alleged Warranties Made by Pilkington.**

26.     Pilkington, the manufacturer of MirroView, published a "technical bulletin" titled ATS-191 concerning MirroView.  Consumers can access ATS-191 on Pilkington's website.[2] (Ex. 4.)  ATS-191 describes MirroView as "a hard, neutral color, pyrolytic reflective coating on clear glass" that is "tough and durable, and for most situations the product can be handled, fabricated, installed and maintained in a similar manner as uncoated glass."  (*Id.*)  In addition to providing guidance on handling, cleaning, and installation, ATS-191 states in bold letters that "**IT DOES NOT CONSTITUE A WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.**"  (*Id.*)

27.     During the two years preceding the building of Lighted Mirrors for the Mandalay Bay, Electric Mirror requested general information regarding MirroView.  Avalon's Jeff Wurzell passed along ATS-191 and some promotional materials published by Pilkington.  By providing this information, Avalon did not adopt any alleged warranties made by Pilkington concerning MirroView.  Under Washington law, "a dealer is not liable upon an express warranty of a manufacturer which is put out with or attached to the goods manufactured unless he, in some way, adopts the warranty and makes it his own when selling the goods to others, and that by merely selling the goods he does not adopt the warranty of the manufacturer as his own*." Cochran v. McDonald*, 161 P.2d 305, 306 (Wash. 1945).  As in most jurisdictions, "[d]elivering, presenting or explaining a manufacturer's warranty, without more, does not render a dealer a co-warrantor by adoption." *Motor Homes of Am., Inc. v. O'Donnell*, 440 So. 2d 422, 427 (Fla. Dist. Ct. App. 1983) (citing cases).  Avalon's act of passing along product information that is otherwise available on the manufacturer's website, without more, did not create any express warranties regarding MirroView.

---

[2] *See* https://www.pilkington.com/en/us/window-manufacturers/technical-bulletins.

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 14
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

**E.    Electric Mirror Cannot Prove Breaches of Contract Unrelated to the Warranty.**

28.    Electric Mirror purports to assert a stand-alone claim for "breach of contract," but its Complaint indicates the contract claim is duplicative of its express and implied warranty causes of action:

> EM and Avalon/Glasswerks entered into several contracts in which EM would pay Avalon/Glasswerks in exchange for Avalon/Glasswerks providing mirrors that were fit to be handled normally, have lighting and displays installed and meet the other representations and warranties made related to the products.

(Dkt. 1 at ¶ 51.)  If Electric Mirror is relying on the same express warranty provisions to support two identical claims based on the same facts, the claim should be dismissed as duplicative and redundant.  The breach of contract claim should also be dismissed if it is based on terms that are *not* expressed in the contract.  *See G.W. Constr. Corp. v. Proof's Serv. Indus., Inc.*, 853 P.2d 484, 486 (Wash. Ct. App. 1993) (observing that an action only "sounds in contract when the act complained of is a breach of a specific term of the contract"); *Owens v. Harrison*, 86 P.3d 1266, 1269 (Wash. Ct. App. 2004) ("An action sounds in contract when the act complained of is a breach of a specific term of the contract, without reference to the legal duties imposed by law on that relationship." (internal quotation marks omitted)).  For these reasons, the Court should dismiss Electric Mirror's generic "breach of contract" claim.

## IV. ELECTRIC MIRROR'S DAMAGES ARE UNSUPPORTED, WHOLLY SPECULATIVE, AND FAIL THE REQUIREMENT OF PROXIMATE CAUSATION

29.    In Washington, the ordinary remedy for breach of warranty is set forth at RCW 62A.2-714:

> (1) Where the buyer has accepted goods and given notification [per subsection (3) of RCW 62A.2-607], he or she may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 15
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

RCW 62A.2-714; *see also* RCW 62A.2-715 (permitting the buyer to recover incidental and consequential damages in proper cases).

30.     Electric Mirror's alleged damages fall into two categories: (1) incidental damages relating to the rebuild of 2,392 Lighted Mirrors; and (2) consequential damages in the form of alleged lost profits.  Electric Mirror has the burden of proving such damages on a rational basis other than by pure speculation and conjecture.  *O'Brien v. Larson*, 521 P.2d 228, 230 (Wash. Ct. App. 1974).  For both incidental and consequential damages, Electric Mirror must prove that the amounts were proximately caused by Avalon's alleged breaches of warranty.  RCW 62A.2-714(2).  "The term 'proximate cause' means a cause which in a direct sequence, unbroken by any new independent cause, produces the injury complained of and without which the injury would not have happened."  *Petersen v. State*, 671 P.2d 230, 241 (Wash. 1983).

31.     **Incidental Damages**:  Electric Mirror seeks to recoup 100% of the costs it allegedly incurred to rebuild the 2,392 Lighted Mirrors without any consideration or apportionment for its own responsibility in causing the damage. These amounts include direct replacement costs for the Lighted Mirrors, including for non-glass components like frames, hangers, and electrical components ($1,782,030.89); mirror "rejection" costs without consideration of credits given ($108,704.27); administrative costs ($145,062.44); field service costs ($88,107.73); transportation, freight, and logistics costs ($75,124.97); temporary labor costs ($42,151.71); warehouse costs ($33,799.95); storage costs ($28,991.79); and future disposal costs ($13,123.26).  Electric Mirror has the burden of proving these sums with reasonable certainty, other than by pure speculation or conjecture, yet none of these incidental damages even acknowledge that the rebuild of the Lighted Mirrors was caused at least in substantial part by Electric Mirror's own actions.  Even if Avalon had any liability—it does not— Electric Mirror should not recover such speculative incidental damages, due to its failure of proof.

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 16
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

32. **Consequential Damages**:

a. Lost profits are recoverable as damages only when "(1) they are within the contemplation of the parties at the time the contract was entered, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty." *Tiegs v. Watts*, 954 P.2d 877, 885 (Wash. 1998) (citing *Larsen v. Walton Plywood Co.*, 390 P.2d 677, 686 (Wash. 1964). Electric Mirror cannot satisfy this standard.

b. Electric Mirror seeks lost profits ranging from $4,002,093 to $4,667,014 during a one-year "loss period" from September 2015 to September 2016. Electric Mirror purports to have calculated these lost profits based on a regression analysis that plotted Electric Mirror's historical production revenue as a baseline for projecting future profits during the loss period. The alleged lost profits are 12,104% to 13,795% higher than Electric Mirror's actual net profits in 2014. Electric Mirror's regression analysis is hopelessly speculative and incomplete because, among other shortcomings, it does not account for Electric Mirror's current or former customers, the company's past or projected market share, or that Electric Mirror's own operations impacted and caused its own damages—including on unrelated projects where Electric Mirror was rebuilding its own defective mirrors. Setting aside Avalon's lack of liability, Electric Mirror cannot recover lost profits that are not merely speculative in the extreme but also wholly fail to account for a series of critical variables.

### V.  AVALON IS ENTITLED TO JUDGMENT ON ITS UNPAID INVOICES, INCLUDING PREJUDGMENT INTEREST AND ATTORNEY'S FEES AND COSTS.

33. Electric Mirror admits that it failed to pay Avalon $245,639.27 on invoices that were unrelated to the Mandalay Bay project. Each unpaid invoice is accruing a finance charge of 1.5% per month, compounded monthly. Avalon is also contractually entitled to recover its attorney's fees and costs incurred to collect these sums. Under the Court's Order on September 18, 2018 (Dkt. 115), Avalon is entitled to a judgment on its unpaid invoices once the Court has ruled upon Electric Mirror's warranty and contract claims.

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 17
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

1

## VI.  **CONCLUSION**

2

34.     Electric Mirror cannot prove that it received goods that were defective in materials

3

and workmanship, or that the goods failed in their specific purpose.  Electric Mirror effected

4

substantial changes to the mirrors supplied by Avalon as part of the fabrication of its Lighted

5

Mirrors for the Mandalay Bay.  Any claim that the mirrors supplied by Avalon suffered from a

6

design defect is not actionable because Avalon did not make an express or implied warranty

7

against defects in the design of the Pilkington-manufactured product.  Avalon has no liability.

8

Also, even if Electric Mirror were to establish some degree of liability, Electric Mirror has not

9

proven incidental or consequential damages that are non-speculative and proximately caused by

10

Avalon's actions.  The Court should dismiss each of Electric Mirror's claims.

11

35.     Electric Mirror admits that it owes $245,639.27 to Avalon, and this amount has

12

been accruing finance charges of 1.5% per month, compounded monthly, for nearly three years.

13

The Court should enter judgment for Avalon in the principal amount of $245,639.27 plus

14

$142,704.62 in prejudgment interest (calculated as of November 29, 2018), and Avalon should

15

be awarded its attorney's fees and costs incurred in the collection of these unpaid invoices.

16

DATED:  November 6, 2018

17

18

LANE POWELL PC                                    CORR DOWNS PLLC

19

By:*/s/ Rudy Englund*                               By:*/s/ Charles P. Rullman*
20
    Rudy A. Englund, WSBA No. 04123          Charles P. Rullman, WSBA No. 42733
    englundr@lanepowell.com                        crullman@corrdowns.com
21
    Aaron P. Brecher, WSBA No. 47212          (206) 686-9856
    brechera@lanepowell.com                        *Associated Attorneys for Defendants*
22
    Telephone: 206.223.7000
    Facsimile: 206.223.7107
23
*Attorneys for Defendants*

24

25

26

27

AVALON GLASS & MIRROR CO.'S
TRIAL BRIEF – 18
CASE NO. 2:16-cv-00665-RAJ
130082.0001/7472979.1

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

## APPENDIX OF FACTS AND EXHIBITS

Avalon Glass & Mirror Co. ("Avalon") submits this Appendix of Facts and Exhibits in Support of its Trial Brief.

**A.    About the Parties.**

2.    Since 1955, Avalon has supplied high quality custom glass and mirror products from its 75,000 square foot facility in Carson, CA.  Jeff Wurzell is Avalon's General Manager.  Mr. Wurzell has worked in the glass and mirror industry for nearly three decades.  Avalon began supplying mirror products to Electric Mirror in approximately 2008.

3.    Electric Mirror was formed in 1992.  It manufactures lighted mirrors and mirror TV technology for the hospitality, commercial, healthcare, senior living, multi-family and residential industries.  Electric Mirror holds itself out as being the "*global mirror technology leader for over 20 years*":

> Electric Mirror is in more hotels than all of our competitors combined, making us the leader in Lighted Mirrors and Mirror TV technology.  Since we first introduced Lighted Mirrors and Mirror TVs to the hotel industry over 16 years ago, we have proudly been on the cutting edge of the latest in design and new technology. We hold the leading market share in the Lighted Mirror industry and our luxury products are found in the hospitality, commercial, and residential markets worldwide.

(https://www.electricmirror.com/industry-leadership/.[3])

**B.    Avalon Supplied Electric Mirror with MirroView for 18 Months Before the Mandalay Bay Project.**

4.    On December 8, 2012, Electric Mirror's Brett Kinney inquired of Avalon's General Manager, Jeff Wurzell, whether "*you have any information on Dia-electric glass?*"  (Ex. 305.)  Mr. Wurzell responded on December 10, 2012 that "*[t]here is a new product called Mirroview which is specifically for your application [sic] do you want to see samples?*"  (*Id.*)  Aside from identifying MirroView as a product offering and providing pricing data, Mr. Wurzell offered no other information regarding MirroView.  (Ex. 14.)

---

[3] Website current as of November 6, 2018.

APPENDIX OF FACTS AND EXHIBITS – 1
CASE NO. 2:16-cv-00665-RAJ

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

5.      On January 7, 2013, Electric Mirror placed its first purchase order (No. 215172) for 20 full size sheets of MirroView (96" x 126 3/8"). (Ex. 307.)  The cost of the order was $16,018.  (*Id*.) Over the next 18 months, Electric Mirror continued to order MirroView in significant quantities.  *See, e.g.*, Ex. 332 (PO 218186); Ex. 335 (PO 218978); Ex. 337 (PO 219163); Ex. 338 (PO 219366); Ex. 344 (PO 220378); Ex. 348 (PO 220641); Ex. 354 (PO 221763); Ex. 365 (PO 222670); Ex. 373 (PO 223302).  During this period, Electric Mirror purchased more than $150,000 in MirroView.  (*Id*.)

**C.      Avalon Played No Role in the Selection of MirroView for the Mandalay Bay Project.**

6.      On or about October 10, 2013, MGM solicited a quote from Electric Mirror to supply lighted and television mirrors for the renovation of the Mandalay Bay.  (Ex. 340: "*[W]e also just got the quote request from MGM for about (3000) mirrors for the Mandalay Bay Renovation, model room in April*.")  At the time, Electric Mirror was working with MGM to supply similar lighted mirrors for the renovation of a separate Las Vegas property, the Delano Hotel. (Ex. 355.)  In November and December, 2013, Electric Mirror worked with MGM on its bid to install lighted mirrors in the Model Rooms that would precede the full renovation of the Mandalay Bay.  (Exs. 343, 345, 346.)  Electric Mirror did not notify Avalon that it was bidding to supply Lighted Mirrors for the Model Rooms.

7.      On February 3, 2014, MGM issued a Purchase Order for five electric and television-equipped mirrors with a delivery date of April 16, 2014. (Ex. 350.)  Through February and March, 2014, Electric Mirror worked internally and with MGM to determine the style, size, and components for use on the Model Room mirrors.  (Exs. 355, 356.)  To obtain the vanishing effect, Electric Mirror would need to use a "V" mirror, or vanishing mirror, which it had historically sourced from Kung Wo, a Chinese manufacturer, or from Pilkington North America. (Ex. 359.)  James "Jim" Mischel, Jr., Electric Mirror's Chief Executive Officer, was personally involved in reviewing the appearance and suitability of the mirror types and sizes that would be presented to MGM.  (Exs. 357: "*Jim would also like to review this with Mirroview V20 again as well*."; Ex. 358.)  For MGM's consideration, Electric Mirror constructed and delivered Model

APPENDIX OF FACTS AND EXHIBITS – 2
CASE NO. 2:16-cv-00665-RAJ

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

Room mirrors fabricated with three different mirror options: (1) regular silvered mirror (the cheapest option); (2) V20 mirror fabricated with Kung Wo (the second cheapest option but only available in limited sizes); and (3) V20 mirror fabricated with Pilkington's MirroView (the mostly costly option but available in larger sizes).   (Exs. 358 (with pictures), 359, 361, 362.) Electric Mirror did not involve Avalon in any aspect of the mirror selection for the Model Rooms.

8.      The original delivery of the Model Room mirrors did not go well.  Electric Mirror delayed building the Model Room mirrors until May 12, 2014—two weeks before the delivery deadline on June 1, 2014.  (Ex. 364: "*Great, so it took from 2/4 to 5/12 to figure it all out and now we have a week or so to make it happen with 3 different types of glass on top of that.*")  After another month-long delay, Electric Mirror delivered Lighted Mirrors for the Model Rooms that were not acceptable to MGM.  (Ex. 376.) Some had scratched metal frames, some mirrors had delaminated near the frosted portion, and others had electronic components that failed.  (Ex. 376-379, 382.)  Throughout July 2014, Electric Mirror scrambled to replace the defective Model Room mirrors.  (*Id*.)  As before, Avalon was not involved directly or indirectly in any aspect of the selection of the mirrors for the Model Rooms.

**D.     Electric Mirror Attempted to Source MirroView Directly from the Manufacturer, Pilkington, for the Mandalay Bay Project.**

9.      On September 2, 2014, Electric Mirror's Supply Chain Buyer, Melissa Morgan, contacted Pilkington's Regional Sales and Marketing Manager, Leif Ortegren, to discuss purchasing MirroView directly from the manufacturer.   (Ex. 387.)  Electric Mirror submitted a credit application and Mr. Ortegren traveled to Electric Mirror for an in-person meeting with Mr. Mischel.  (Exs. 387–390.)  By October 2014, Electric Mirror had determined that it could not purchase directly from Pilkington due to the supplier's requirement that it ship mirrors by the truckload, which is 22 tons per load.  (*Id*.)  Only after Electric Mirror determined that it could not purchase MirroView directly from Pilkington did Electric Mirror inquire if Avalon could supply MirroView for the Mandalay Bay project.  (Ex. 390–391.)

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

**E.    The First Build of Mirrors for the Mandalay Bay Project Satisfied Electric Mirror's "Mainline" Criteria.**

10.    On October 27, 2014, Electric Mirror submitted its bid to supply 3,239 Lighted Mirrors (a small number of which had televisions) for the full Mandalay Bay renovation, at a cost of $4,346,720.  (Ex. 392.)  That same day, Electric Mirror's Melissa Morgan emailed Jeff Wurzell and Genaro Martinez of Avalon:

> Just a heads up on this.  We should be getting a large production order soon calling for V20…. It will be 3,200 units.  Their expected install will begin in April of 2015, and we should expect to ship about 530 units a month, starting then.  […] We do not have a PO for this yet, but wanted you to be aware and ready for planning, since this is such a large quantity.

(Ex. 393.)

11.    Throughout November and December 2014, Electric Mirror continued to refine its bid for the Mandalay Bay project.  (Exs. 396–398.)  On December 15, 2014, Mr. Mischel wrote to MGM that he was "looking at an option to use the less expensive mirror from China (V1) for the smaller sizes and the more expensive mirror from the US (V2) for the larger sizes."  (Ex. 398.)  Neither Mr. Mischel nor anyone else at Electric Mirror involved Avalon in the decision on whether to use MirroView for the Mandalay Bay project.

12.    On January 14, 2015, Avalon provided a quote to Electric Mirror for the sale of 2,750 full-size sheets of MirroView at $199.00 per unit, to be delivered in monthly increments through July 2015.  (Ex. 406.)  Electric Mirror adjusted the quantity and delivery schedule, requesting that a production of 2,885 sheets be completed by May 25, 2015.  On January 15, 2014, Electric Mirror issued Purchase Order 226958 for the MirroView mirrors.  (Ex. 25.)

13.    Avalon supplied Electric Mirror with MirroView from February 16, 2015 until June 26, 2015.  Electric Mirror contracted with a common carrier to deliver the crates from Avalon's facility in California to Electric Mirror in Everett, Washington.  During this period, Electric Mirror issued four more purchase orders (Nos. 227128, 228978, 229693, and 229822) for an additional 1,052 sheets, bringing the total number of units to 3,937.  (Ex. 151.)

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

14.     About one month after Electric Mirror placed its January 15, 2015 purchase order for MirroView, Avalon's Jeff Wurzell visited Electric Mirror's factory in Everett. (Ex. 28.)  The visit was not specific to Electric Mirror's work in Las Vegas; rather, the meeting was focused on Electric Mirror's request that Avalon's supply of glass fabricated for medicine cabinets (referred to as "med-cab") be processed "above and beyond the ASTM standard." (*Id*.)  Electric Mirror understood that if it was ordering goods above the industry standard, it was essential to communicate these special terms to Avalon. (*Id*.)  The discussion between Avalon and Electric Mirror about "*100% quality*" for med-cab continued into April 2015, but Electric Mirror made no similar inquiries about MirroView being supplied above the industry standard. (Ex. 410.)  On May 27, 2015, Electric Mirror's Michael Andrich visited Avalon's factory. (Ex. 32.)  As before, Electric Mirror did not inform Avalon that MirroView needed to be processed above the industry standard. (*Id*.)

15.     Electric Mirror processed and fabricated the Lighted Mirrors for the Mandalay Bay from February to June 2015, using the company's "Mainline Mirror" Criteria. (Ex. 482: "*Mandalay Bay was completed on Mainline[.]*"; *see also* Ex. 413.)   The Mainline Criteria set forth the acceptable quantity and nature of front-surface blemishes that can exist on a mirror without it being rejected.

16.     Once a pre-cut mirror was accepted and cleared for production under the Mainline Criteria, Electric Mirror processed and fabricated the Lighted Mirror as follows:  EM laminated the rear-surface of the mirrors with vinyl (to prevent fracturing in the event of a break); laser plotted the rear-surface of the mirrors in a face-down position to score/cut the portions of the vinyl that would be removed; removed the excess vinyl (often with fingernails and razorblades); sandblasted the rear-surface of the mirrors to create a frosting effect; washed the mirrors; and attached the chassis, hangers, and electrical components. (Ex. 313.)

17.     From February to June, 2015, Electric Mirror used two methods to sandblast the rear-surface of the Lighted Mirrors and create a frosting effect.  The first method involved the use of an automated sandblasting cabinet, which removed the black paint and a layer of glass

APPENDIX OF FACTS AND EXHIBITS – 5
CASE NO. 2:16-cv-00665-RAJ

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

according to pre-programmed coordinates.  This method was too slow to satisfy the delivery schedule for the Mandalay Bay project.  As an expedited alternative, Electric Mirror designed and constructed its own sandblasting booth, which was a wooden, enclosed box with a pressurized sandblasting hose.  An employee in protective gear would manually sandblast the mirrors as they traveled through the booth on a conveyor belt.  Electric Mirror could sandblast the mirrors more quickly in the booth, but the process suffered from persistent human error.  Electric Mirror discarded a significant quantity of MirroView that was either over-blasted or under-blasted.  The sand and other materials used for the sandblasting seeped under the vinyl backing, leading to scratches, blemishes, and other imperfections.

18.    Before packaging and shipping the fully-fabricated Lighted Mirrors to MGM's construction warehouse in Las Vegas, each Lighted Mirror received a final quality check according to the Mainline Criteria.  From May to June 2015, Electric Mirror shipped 3,332 Lighted Mirrors to Las Vegas with the specific expectation that the goods satisfied not only Electric Mirror's quality expectations, but also the expectations of MGM.

19.    Once the mirrors arrived in Las Vegas, they sat in the MGM warehouse for several weeks before being uncrated.  The temperatures in the warehouse often exceeded 120 degrees. (Ex. 490: "*While some frames may have issues for other reasons, we believe a great deal is the result of storage in the MB warehouse where temperatures exceeded 120F or even 130F for extended periods of time.  We do not design our products for these conditions*.")   The extreme temperatures wreaked havoc on the metal frames, which bent and contracted, as well as the glue used to attach the hangers, which melted and shifted.  (*Id*.; Ex. 59.)

**F.    MGM Rejected the First Build Mirrors for Reasons Unrelated to the Mirroview Purchased from Avalon.**

20.    On July 6, 2015, MGM notified Electric Mirror that the first two floors of Lighted Mirrors that had been installed had significant problems.  (Ex. 35, 36; *see also* Ex. 428 with photos, Ex. 429.)  Jim Mischel traveled to Las Vegas to see the problems firsthand.  (*Id*.) His report on July 10, 2015 described bad frames, glue streaks, shoddy and incomplete sandblasting,

APPENDIX OF FACTS AND EXHIBITS – 6
CASE NO. 2:16-cv-00665-RAJ

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

130082.0001/7472979.1

and electric failures.  (Ex. 432, identifying defects.)  Mr. Mischel's initial report made no reference to front-surface scratches. (*Id.; see also* Ex. 430: "*From the pictures sent it appears that there is an issue with the mirror coating on the back of the glass*.")

21.     Electric Mirror did not notify Avalon about the discovery of problems with the Lighted Mirrors.  Instead, Electric Mirror sent a crew of technicians to Las Vegas and rented a warehouse (referred to as the Advantage Warehouse) to inspect and attempt to repair the Lighted Mirrors.  (Ex. 433.)  MGM delegated the task of further inspecting the Lighted Mirrors to its electrical subcontractor, Bombard.  Bombard built inspection carts and delivered them to the Advantage Warehouse.  (Ex. 440.)  Bombard continued to reject Lighted Mirrors for recurring problems with broken and disjointed frames, bad frost, and electrical components that did not work.  (Ex. 453.)  On July 13, 2015, Bombard's Ryan Redmond reported: "*Just started 200 wing on floor 16.  All the mirrors we have opened to this point have frost issues*."  (Ex. 437, with pictures; *see also* Ex. 438: "*Worst today*," describing bad frosting with picture.; *see also* Ex. 442, with pictures of detached frames; Ex. 443, describing issues with frost; Ex. 444, picture of cracked mirror.)  On July 21, 2015, Electric Mirror's Bill Schoonover reported on a single day of inspections that "*[s]o far we have rejected about 23 out of 140 but only 1 due to bubbles in the glass.  **The rest were due to internal manufacturing issues***."  (Ex. 446, emphasis added.)

22.     On July 26, 2015, Electric Mirror's Eddie Nellis, who oversaw the inspection and rebuild efforts in Las Vegas, diagnosed why so many Lighted Mirrors were being rejected:

> The issues with the TV mirrors is pitting on the front of the mirror.  I believe these mirrors are from the same group that went through the new blast room during start up.  I remember we discarded many mirrors with issue [sic] in the beginning phase of the blasting process, these will have to be replaced. I would suggest that any future V mirrors are blasted in the older machines to get the best possible uniform blasting.

(Ex. 41.)  The following day, Electric Mirror's Jim Mischel confirmed that sandblasting was the cause of so many mirrors being rejected:  "*Michael, I assume you are watching blasting closely as I see more of these mirror [sic] coming through*."  (Ex. 454.)  Even after Electric Mirror inspected certain Lighted Mirrors, problems persisted.  On July 27, 2015, Bombard's Ryan

APPENDIX OF FACTS AND EXHIBITS – 7
CASE NO. 2:16-cv-00665-RAJ

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

130082.0001/7472979.1

Redmond reported:  "*Some of the mirrors that were reinspected sill [have] frost issues*."  (Ex. 451, 452; *see also* Ex. 470: "*It was brought to our attention that we are experiencing quality issues with the mirrors that have gone through review/inspection*.")

23.     Electric Mirror also acknowledged the damage caused to the Lighted Mirrors by inferior packaging.  On July 27, 2015, Electric Mirror's Eddie Nellis reported to the company's leadership that he encountered a crate where "*[a]ll of the defects were frame related and the pictures will show frame supports were loose and the mirror frame was not supported*."  (TR 44.)  He advised that "*our packaging is in need of priority review and what we are currently using is not appealing when you open the box….Mirrors that have aluminum or steel frames should be protected with a film to prevent minor scratches and blemishes*."  (*Id*.)

24.     According to Electric Mirror, as of July 22, 2015, Bombard and MGM were inspecting to "*impossible to meet standards*."  (Ex. 453.)  Within a week of Jim Mischel notifying his team of the problems with the Lighted Mirrors, on July 16, 2015, Electric Mirror was modifying its quality criteria for the project.  (Ex. 441.)   Electric Mirror did not involve Avalon in any of these discussions or plans to rebuild the Lighted Mirrors.

25.     On August 6, 2015, Electric Mirror's Michael Andrich traveled to Avalon's facility for an in-person meeting with Mr. Wurzell.  (Ex. 461, 467.)  The subject of the meeting was general quality improvements with specific emphasis on "medcab," or medicine cabinet, mirror.  Mr. Andrich did not discuss any of the problems on the Mandalay Project while visiting Avalon's facility.

**G.     Electric Mirror Implemented Heightened Inspection and Quality Requirements for Mirrors for the Mandalay Bay Project.**

26.     On August 7, 2015, Electric Mirror placed its first new purchase order for 400 pieces of MirroView to be used on the rebuild of the Lighted Mirrors for the Mandalay Bay project.  (Ex. 469.)  Electric Mirror did not report to Avalon how this order would be utilized, nor did Electric Mirror seek cost-free replacements of the original mirrors.  (*Id*.)

APPENDIX OF FACTS AND EXHIBITS – 8
CASE NO. 2:16-cv-00665-RAJ

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

130082.0001/7472979.1

27.     On August 11, 2015, Jim Mischel wrote to MGM that Electric Mirror had implemented "*our much stricter inspection criteria*," but he also acknowledged the impossibility of MGM demanding "perfection."

> But at this point I really don't know how to meet [MGM's] new mirror expectations of perfection without throwing away 70% of all the mirror.  We can only hold our supplier to the ASTM standards.  Our inspection criteria exceeds those; so we are absorbing all the cost for our higher standard.  Now our team is raising the standard to perfection; given the type of mirror we are dealing with I'm not sure how to accomplish that.

(Ex. 473.)  Despite *"raising the standard to perfection*," Electric Mirror did not notify Avalon of any changes in its quality expectations.  Instead, Electric Mirror communicated to Avalon: "*MGM is seeking perfection with the mirror and we are trying to get the best information possible to show that it won't be perfect*."  (Ex. 476.)  That same day, August 11, 2015, Electric Mirror circulated a "Mandalay Bay Rework Plan" that made no mention of Avalon or its role in supplying MirroView.  (Ex. 55.)

28.     On August 19, 2015, Electric Mirror's Don Jacques and Jim Mischel visited the Mandalay Bay to inspect mirrors that had already been re-inspected by Electric Mirror, but were still being rejected by MGM.  (Ex. 59.)  Electric Mirror noted that a certain percentage of Lighted Mirrors were being rejected due to "*small*" scratches, and the cause was likely "*the supplier, on the main line caused by the rollers, during shipping, or installation*."  (*Id*.)  During the same inspection, Electric Mirror noted that "*[a]pproximately 1/3 of all mirrors rejected by EM team*" were due to frame damage, including "*corner separation, filings on the frame interior, and scratches*."  (*Id*.)  With regard to the frosted areas, where damage was continuing to be discovered, Electric Mirror recommended "*[n]o further blasting of V Mirror in hand booth*," as it was resulting in "*[u]neven sandblasting and over blasting*."  (Id.)

29.     On August 24, 2015, Electric Mirror discovered an entire crate of finished Lighted Mirrors in its Las Vegas warehouse that had been stapled shut, rather than taped.  (Ex. 486, with picture.)  The staples ruined the frames.  (*Id*.)  In addition, Electric Mirror acknowledged that the recurring defect causing Lighted Mirrors to be rejected was not front-surface scratching, but

APPENDIX OF FACTS AND EXHIBITS – 9
CASE NO. 2:16-cv-00665-RAJ

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

130082.0001/7472979.1

rather poorly executed sandblasting and frosting. (Ex. 489: "*The main and initial rejectable issue I kept running across was inconsistent/jagged frost line and etch lines*.") Electric Mirror also complained to MGM that excessive warehouse temperatures were to blame for a litany of frame-related damages:

> We have been reworking many units with frame damage. For example, the gaps in the frame corner exceed our desire, as well as yours. Also, in many instances, the glue frame has popped off the mirror loosening the frame attachment. On these, the frame appears twisted as well. This is a direct result of excessive hear, and the expansion and contraction of the metal frame. While some frames may have issues for other reasons, we believe a great deal is the result of storage in the MB warehouse where temperatures exceeded 120F or even 130F for extended periods of time. We do not design our products for these conditions.

(Ex. 490; *see also* Ex. 499: "*Forgot to add there is [sic] 12 crates on the way to EM with bad frames that left this morning.*"; Ex. 504: "*Here is pictures I took of [frame] material with scratches[.]*")

30.    On September 4, 2015, Electric Mirror released a "special criteria" for the inspection and approval of Lighted Mirrors for the Mandalay Bay. (Ex. 496.) **Electric Mirror did not disclose this new criteria to Avalon**. Among other changes, Electric Mirror mandated that all mirrors be sandblasted in the automated cabinet ("***DO NOT USE HAND BLAST***"). (Ex. 496; emphasis in original.) This new quality criteria deviated from the standard Electric Mirror utilized for the original build of Lighted Mirrors for the Mandalay Bay. (Ex. 482: "*I have attached the Mainline and Model Room criteria. Mandalay Bay was completed on Mainline[.]*"; Ex. 497: "*Keep in mind we are building to an above industry standard and the attached is our criteria we have implemented just recently.*")

31.    Even with a new quality criteria, Electric Mirror continued to suffer from self-inflicted damage to the Lighted Mirrors. On September 11, 2015, Electric Mirror's Irving Bernal acknowledged that the quality control employees were using "*abrasive wipes*" to wipe down the sandblasted area and they are "*SCRATCHING IT.*" (Ex. 501.) In addition, Electric Mirror's Tashia Wampler wrote on September 17, 2015: "*I rejected 2 X V20 MB mirrors tonight in Blasting (post blast) that had multiple bubbles within the blast area on the bottom left corner.*

APPENDIX OF FACTS AND EXHIBITS – 10
CASE NO. 2:16-cv-00665-RAJ

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

130082.0001/7472979.1

*Sad times*.") (Ex. 505.)

32. From August to November 2015, Electric Mirror ordered an additional 2,526 pieces of MirroView. Electric Mirror did not claim that the new goods were intended to replace mirrors that were initially shipped by Avalon six to eight months earlier.[4] (Exs. 491, 493.)

**H. Electric Mirror Did Not Inform Avalon of the Problems on the Mandalay Bay Project Until the Second Build Was Nearly Complete.**

33. On October 1, 2015, Electric Mirror's Melissa Morgan wrote to Avalon's Jeff Wurzell about concerns regarding rear-surface paint issues ("*pinholes*" and over-spray), and "*pointed blemishes*." (Ex. 512.) Ms. Morgan also commented that "QC has gone down considerably over all," but she makes no mention of Electric Mirror imposing a heightened quality control criteria. (*Id*.)

34. On October 10, 2015, Electric Mirror's Michael Andrich wrote to Jeff Wurzell to confirm Avalon's ability to continue supplying MirroView. (Ex. 515.) Jim Mischel also commented that Electric Mirror was experiencing a significant number of "scratches." (Id.) However, there is no indication whether Mr. Mischel is referring to its Mainline criteria used for the original build of Lighted Mirrors, or the new quality criteria developed to address MGM's demand for perfection. Electric Mirror did not send any demands for replacements, cost credits, returned product, or photographs to substantiate the alleged scratching. (*Id*.)

35. On October 13, 2015, Jim Mischel wrote to MGM concerning the status of progress payments due on the Mandalay Bay project. (Ex. 86.) He falsely stated that "*our supplier [Avalon] has been unwilling to accept responsibility for their share of the micro-scratches stating that the product is within the ASTM standards*." (*Id*.) As of the date of this message, Avalon had never been asked to "take responsibility" for anything and Electric Mirror was continuing to order MirroView without condition. Mr. Mischel also reiterated that the "*MGM expectations are much higher than those of ASTM, and [Electric Mirror's] own internal*

---

[4] On September 10, 2015, Electric Mirror's Michael Andrich wrote to Avalon's Jeff Wurzell about "overage paint Fenzi." (Ex. 67.) As described above, Electric Mirror ordered back-painted MirroView. To the extent Avalon delivered any mirrors to Electric Mirror with paint splatter or speckles, such an issue would be identified on the initial inspection and would have nothing to do with the durability of the front, reflective coating.

APPENDIX OF FACTS AND EXHIBITS – 11
CASE NO. 2:16-cv-00665-RAJ

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

130082.0001/7472979.1

*standards.*" (*Id.*)  Finally, he stated that "*we are rejecting mirrors for insignificant issues hardly visible to the human eye*" and the "*new inspection criteria seems to far exceed industry contract standards.*" (*Id.*)

36.     On November 20, 2015, Electric Mirror first claimed that it was entitled to some unspecified amount of credit for allegedly defective goods.  (Ex. 526.)  There is no indication whether Electric Mirror was claiming that the mirrors were defective under MGM's "*perfection*" standard, or whether the mirrors allegedly failed to comply with Electric Mirror's Mainline Criteria.

37.     Electric Mirror did not request credits for any allegedly defective mirrors until December 8, 2015.  (Ex. 554).  Despite Electric Mirror's failure to support its request for credits, Avalon granted a credit of $33,858.00 based on Electric Mirror's claims of "Bad Out of the Box" goods.  Internally, on December 11, 2015, Electric Mirror acknowledged that it had not kept Avalon informed of the problems on the Mandalay Bay project or that Electric Mirror would be seeking credits for allegedly defective goods:

> Jeff [Wurzell] complained to me that no-one on our end complained of the magnitude of quality issues with MB project until most recent when I asked we [sic] bring Jeff in see first-hand.  We need to share the MRB data you are collecting with the supplier(s) and decide disposition routinely each week.  **Jeff's impression of why we were ordering more MB V20 mirror was incremental orders, not realizing the quality aspect of rejects. I'm not sure I believe everything he says, but he does have a point to some extent**.

(Ex. 579; emphasis added.)

38.     In December 2015, representatives from Electric Mirror visited Avalon and proposed a handful of increased quality procedures.  These enhancements were not necessary to produce mirrors that meet industry quality standards.  Nonetheless, Avalon agreed to implement the above-industry standard precautions as a business relationship courtesy.

39.     At the end of December, 2015, Electric Mirror disassembled its equipment and vacated the factory where it had fabricated the Lighted Mirrors for the Mandalay Bay.  Electric Mirror never allowed Avalon to observe the processes that were causing the damage to the Lighted Mirrors for the Mandalay Bay.

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**I.    Avalon Fully Cooperated in Electric Mirror's After-the-Fact Attempt to Diagnose How Mirrors Were Damaged by Electric Mirror's Process.**

40.    In late December, 2015, Avalon coordinated communication between itself, Electric Mirror, and the product manufacturer, Pilkington.  This included an in-person meeting at Electric Mirror's new facility on January 11, 2016.  The attendees were unable to assess any of the equipment (including the sandblasting booth) Electric Mirror used to fabricate the first build of Lighted Mirrors for the Mandalay Bay mirrors or nearly all of the replacement Lighted Mirrors.  During the January 11, 2016 visit, the Pilkington representatives explained that MirroView is used successfully around the world without issues, and that the product is very hard, durable, and chemically resistant.  (Ex. 543.)

41.    On January 20, 2016, representatives from Avalon, Electric Mirror, and Pilkington visited Avalon's factory in Carson, CA.  Pilkington later reported to the parties that "*[w]e observed **potential** sources for scratching but all were considered low risk.*"  (Ex. 548*; emphasis in original.*")

42.    Electric Mirror completed the Mandalay Bay project on March 14, 2016.  (Ex. 559.)

**J.    Electric Mirror Withheld Payment on Unrelated Invoices "As Leverage."**

43.    On January 26, 2016, Electric Mirror decided to withhold hundreds of thousands of dollars in unpaid invoices unrelated to the Mandalay Bay project "as leverage."  (Ex. 549.) Consistent with its stated intentions, Electric Mirror admits that it withheld $245,639.27 in payment on invoices unrelated to the Mandalay Bay project (the "Unpaid Invoices"), as a setoff to sums it alleges are owed from Avalon.  The Unpaid Invoices were issued between December 9, 2015 and April 12, 2016.

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

1

## **CERTIFICATE OF SERVICE**

2

3        Pursuant to RCW 9A.72.085, the undersigned certifies under penalty of perjury under the laws of the State of Washington, that on the 6th day of November, 2018, the document attached hereto was presented to the Clerk of the Court for filing and uploading to the CM/ECF system. In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following persons:

4

5

6    Kyle D. Netterfield, WSBA #27101
     Connor Rankin, WSBA #52514
7    Ellis, Li & McKinstry PLLC
     2025 First Avenue, PHA
8    Seattle, WA 98121-3125
     Telephone: (206) 682-0565
9    Facsimile: (206) 625-1052
     knetterfield@elmlaw.com
10   crankin@elmlaw.com
     *Attorneys for Plaintiff*
11

12   Rudy A. Englund, WSBA No. 04123
     Aaron P. Brecher, WSBA No. 47212
     Lane Powell PC
13   1420 Fifth Avenue, Suite 4200
     Seattle, WA 98101
14   Telephone: 206.223.7000
     Facsimile: 206.223.7107
15   englundr@lanepowell.com
     brechera@lanepowell.com
16   *Attorneys for Defendants*

17

18        Executed on the 6th day of November, 2018, at Seattle, Washington.

19                                          */s/ Charles P. Rullman*
                                            Charles P. Rullman, Attorney
20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE
CASE NO. 2:16-cv-00665-RAJ

130082.0001/7472979.1