The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELECTRIC MIRROR, LLC, a Washington limited liability company, | CASE NO. 2:16-CV-00665-RAJ |
| Plaintiff, | ELECTRIC MIRROR'S TRIAL BRIEF |
| vs. | |
| AVALON GLASS AND MIRROR CO., a California corporation, | |
| Defendant. | |

## I.  INTRODUCTION AND SUMMARY FACTS

The mirrors Avalon manufactured and sold to Electric Mirror (*EM*) for use in the Mandalay Bay remodel were not as Avalon represented. Avalon's mirrors were neither tough nor durable and could not be handled like normal glass. They were not "superior to any mirror in the world" and "ready to use out of the box" or "specifically for EM's application." Instead, Avalon's mirrors were very difficult to work with and susceptible to a condition that later became known as "micro-scratching." Although Avalon knew in advance that their mirrors fabricated with

ELECTRIC MIRROR'S TRIAL BRIEF    Page 1
2:16-CV-00665-RAJ

Ellis | Li | McKinstry
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206.682.0565  Fax: 206.625.1052

Pilkington MirroView were for use at an MGM hotel in Las Vegas and more delicate than normal mirrors, Avalon neither warned EM, nor took extra care.

### A. Avalon and Electric Mirror both handled Avalon's mirrors like normal glass.

Avalon manufactured its mirrors using the same processes it always used. Likewise, EM followed its standard processes when using Avalon's mirrors to build 3351 lighted mirrors for the Mandalay Bay remodel in 2015. Before Mandalay Bay, EM had a long history of successful projects with MGM. And leading up to 2015 had successfully built almost a million custom lighted mirrors for installation around the world.

### B. EM's had production challenges during the first build.

Production challenges are not unusual in EM's innovative custom manufacturing process. But in early July 2015, MGM notified EM they were finding an unusually high frequency of problems during installation at Mandalay Bay. In particular, EM's frames, frosting and cleaning were well below expectations. EM's CEO, Jim Mischel immediately went to Las Vegas to learn the nature and scope of the challenges and take action to resolve them.

Throughout July and into August, EM personnel worked in a rented warehouse in Las Vegas to fix the problems they could resolve and segregated potentially repairable frame issues for shipment back to Everett, Washington.

Lighted mirrors that passed this first inspection were taken to Mandalay Bay for installation. But, as these inspected mirrors were being installed, previously undetected scratches were appearing on the surface of the mirror in the hotel room.

### C. EM had to rebuild 2291 lighted mirrors

From August 2015 through January 2016, EM struggled to simultaneously take care of its customer, mitigate its mounting losses and understand the source and nature of the mysterious scratches. Throughout September 2015, EM learned

handling techniques to reduce the risk of micro-scratching and inspection methods that would predict what scratches were likely to become visible at the hotel. It also negotiated successfully with MGM to establish a criterion unique to Avalon's MirroView mirrors.

Ultimately, EM rebuilt 2291 lighted mirrors, which were shipped to Las Vegas along with 101 repaired mirrors from those shipped back to Everett in August and September. As the rebuild progressed through October and November 2015, EM remained in regular contact with Avalon to purchase several thousand replacement mirrors and raise quality issues as they became apparent.

### D. Avalon failed to implement updated quality control standards, and Pilkington confirmed Avalon caused micro-scratching on the mirrors.

During the rebuild, EM tried to work with Avalon to improve Avalon's quality control and handling of the mirrors. It was not until December that Avalon began changing some of its methods in handling the glass. Not surprisingly, in January 2016, Pilkington confirmed Avalon was the cause of the micro-scratching on the face of the mirrors. During a site visit to Avalon's processing center, Pilkington reported that Avalon had no formalized quality management system. "[Y]ou would have to see Avalon's process first-hand to appreciate, but, any scratching is most likely the result of their handling."

### E. Pilkington disclosed the inherent defects after the damage was done.

On January 25, 2016, for the first time, Pilkington disclosed the reason fine scratches on MirroView can be so much more visible than regular mirror in certain lighting situation. The specifically identify the latent defect as follows "Optical effect of micro-scratches on front surface will be more pronounced on Pilkington MirroView compared to uncoated glass." The previously undisclosed cause is "Reflection from the exposed surface of Mirroview™ (as opposed to uncoated glass surface is much higher (69%-vs-4%) which would make any level of scratching easier

to identify/view." Therefore, on standard mirror a "Micro-scratch only affects surface with 4% reflection" but on Mirroview™ the same "Micro-scratch could result in contrast of up to 65% reflection."

## II.   AUTHORITIES

### A. Avalon breached its express warranty that its mirrors for the first build could be processed like normal mirror.

Avalon, through its written statements, oral promises, adoption of NSG documents and course of dealing repeatedly warranted that its mirrors fabricated with MirroView were tough, durable, easy to handle like normal glass and specifically for EM' application. Avalon breached these warranties.

> (1) Express warranties by the seller are created as follows:
>
> > (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> >
> > (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

The Washington Supreme Court has found:

> A particular purpose is, in fact, the purpose expressly or impliedly communicated to the seller, for which the buyer buys the goods; and it may appear from the very description of the article…Knowledge of the buyer's particular purpose may be shown from the sale alone.

*Libke v. Craig*, 35 Wash.2d 870, 877 (1950); *see also, Fed. Signal Corp. v. Safety Factors, Inc.*, 125 Wash.2d 413, 424-25 (1994) ("The more specific a statement, the more likely it is an affirmation of fact or promise.")

Avalon's General Manager, Jeff Wurzell openly admits personally delivering Pilkington's MirroView technical data sheet and marketing materials to EM's CEO, Jim Mischel, well before the Mandalay Bay project began. The literature states:

- "Pilkington's MirroView is tremendously durable and can be easily handled, transported and processed…Due to the durability of the pyrolytic coating."

- "The coating is tough and durable, and for most situations the product can be handled, fabricated, installed and maintained in a similar manner as uncoated glass."

In Washington, even an advertising brochure can create an express warranty. *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wash. 2d 334, 347-48 (1992). In *Touchet*, the brochure represented the company could "design your specifications," that fabrication "is carefully checked by our quality control department," and that "your particular requirements will determine the most suitable style of construction." *Id.* at 348. Avalon's use of NSG's technical information to direct EM to its MirroView mirrors creates a promise similar to the seller in *Touchet. Id.*

### B.  Avalon breached its warranties of fitness for particular purpose.

Avalon's warranties of fitness for particular purpose were created expressly through the Purchase Orders applicable to each mirror it sold for the first build and by the UCC at RCW 62A.2-315.

#### a)  Express warranty of fitness for particular purpose.

The purchase orders applicable to each sale from Avalon to EM creates express warranties of fitness.

> …Seller warrants that the goods and services furnished will be free from defects in materials and workmanship, merchantable and in full conformity with Buyer's specifications, drawings, and data, and Seller's descriptions, promises, or samples, and **that such goods will be fit for the Buyer's intended use**, provided Seller has reason to know such use….

(emphasis added).

#### b)  Implied warranty of fitness for particular purpose.

Likewise, similar warranties of fitness implied by law attached to every mirror Avalon sold to EM for Mandalay Bay.

ELECTRIC MIRROR'S TRIAL BRIEF  
2:16-CV-00665-RAJ

Page 5

Ellis | Li | McKinstry  
Market Place Tower  
2025 First Avenue, Penthouse A  
Seattle, WA 98121-3125  
206.682.0565  Fax: 206.625.1052

> [T]he seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is… an implied warranty that the goods shall be fit for such purpose.

RCW 62A. 2-315. At comment #2 in this section, the UCC states:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

The Washington Supreme Court has found:

> The act of purchase and use of a product manufactured for that use is evidence of reliance on the skill and judgment of the manufacturer; and, in the absence of evidence to the contrary, meets the requirement of reliance. As we said in *Baum v. Murray*:
>
> > [R]egardless of what we may ultimately decide when a case is presented involving a retailer only, the manufacturer-retailer stands in a different position, as he is the one who is in the best position to ascertain and know the quality and fitness for purpose of the food he manufactures and sells, and it necessarily follows that purchasers of food put up in sealed containers, as the sausage in question was (encased in sausage skin) must and do rely upon his skill and judgment.

*Kasey v. Suburban Gas Heat of Kennewick, Inc.*, 60 Wash.2d 468, 472–73 (1962) (internal citations omitted).

    **2.** *The Warranty of Fitness applies because Avalon knew Electric Mirror's business and knew its MirroView mirrors were for an MGM hotel in Las Vegas.*

Avalon was EM's primary manufacturer of standard mirror for several years before Mandalay Bay. Jeff Wurzell regularly visited Electric Mirror to provide product information, sell new opportunities, and trouble shoot quality challenges. Furthermore, Avalon knew EM's MirroView order in January 2015 was for an MGM hotel in Las Vegas. Randy Steinberg actively participated in securing the MirroView

order from Pilkington when he called Pilkington and told them that a large MirroView order was coming from Electric Mirror. He told Pilkington the "end use is back painted MirroView with the paint stripped in the area where the TV will sit behind. The project is a large hotel. 3,000 lites. Size ~ 40" x 70."". Two days later, when Avalon prepared the first Order, it marked the job as MGM. Avalon's sales manager indicates that information came from EM's purchase order.

> **Q**: Do you know, as you are sitting here today, how you received the information that this was for the MGM job back in 2015?
>
> **A:** We received a PO identifying that that was the PO for the MGM project.

When Pilkington asked for more detail, Jeff Wurzell confirmed the project was an MGM hotel in Las Vegas. And Mr. Steinberg elaborated that MGM was "renovating their rooms to make them more modern. Avalon back paints the MirroView and removes the area where the flat screen TV is hung on the wall and will sit behind."

### C. Avalon breached its express warranty that its mirrors would be free from defects because they had micro-scratches when it shipped.

Electric Mirror's purchase order with Avalon states:

> …Seller warrants that the goods and services furnished will be free from **defects in materials and workmanship**, merchantable and in full conformity with Buyer's specifications, drawings, and data, and Seller's descriptions, promises, or samples, and that such goods will be fit for the Buyer's intended use, provided Seller has reason to know such use….

Avalon caused micro-scratching on the face of its MirroView mirrors, which neither Avalon nor EM could detect when handling and inspecting them like normal mirrors.

**D. Avalon's representations and the latency of the defects reasonably induced EM to accept defective MirroView mirrors during the first build.**

Electric Mirror revoked its acceptance of Avalon's defective mirrors upon learning the true nature of the defect. The timing of EM's notice was reasonable both because it was difficult to discover the nature of the defect and because of Avalon's ongoing assurance that there was nothing wrong with mirrors.

RCW 62A.2-608, with relevant commentary, states:

> The buyer may revoke his or his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him or her if he or she has accepted it:
>
> [...]
>
> (b) Without discovery of such nonconformity if his or her acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> Part (b) relates to non-conformities not discovered at the time of acceptance, either because they were latent ... *Gilpatrick v Downey* [sic], 143 Wash. 671, 255 P 1028 (1927).

In *Gilpatrick v. Downie,* it was undisputed at the time of sale, that neither party was aware the cedar poles were infested with worms "which was a latent defect." 143 Wash. 671, 672 (1927). The Washington Supreme Court held:

> [Downie] had inspected the poles, but there is no dispute of the fact that he did not nor could he by any reasonable inspection, discover their latent defect. [Gilpatrick] contends that by the acceptance of the poles the purchase was complete and that under the rule of caveat emptor the purchaser must pay. That rule would apply in the case of a trader selling to another in the absence of an express warranty, but not in a case such as this. **It makes no difference whether it be called condition broken or implied warranty, the obligation rests upon this kind of a vendor not to deliver such goods with latent defects, notwithstanding prior reasonable inspection**. Here the [Gilpatrick] took the tree standing in the forest, handled, altered,

> and improved it until it was another thing complete and ready for use. **Within this division of the law his position was in the nature of a manufacturer rather than a trader.**

*Id.* at 672-73 (emphasis added).

In *Libke v. Craig*, it was undisputed at the date of sale, Craig inspected the hay and rejected several bales due to water damage. 35 Wash.2d at 873. However, evidence was introduced that due to the size and number of bales of hay it was "generally impossible to tell from inspection whether or not the interior of a bale of hay has become waterlogged." *Id.* Importantly, the court noted Libke "was not a mere dealer, who had no reason to be aware of latent defects in the product sold." *Id.* at 877.

> Appellant grew and baled the hay, and comes within the scope of the text in 1 Williston on Sales (Rev. ed.) 632, § 240, where the rule is stated as follows: 'The word 'manufacturer' is given a wide meaning in the law of implied warranty. All sellers who produce the article which they sell are classed in this category—thus a grower of plants or seeds or crops and [those] who breeds horses or cattle are included.'

*Id.*

EM did not understand the nature of the defects until January 2016 when Pilkington disclosed the reason fine scratches on mirrors made from Mirroview are more visible than on regular mirror in certain lighting situation. Pilkington articulates a portion of the defect as follows: "Optical effect of micro-scratches on front surface will be more pronounced on Pilkington Mirroview™ compared to uncoated glass." "Reflection from the exposed surface of Mirroview™ (as opposed to uncoated glass surface is much higher (69%-vs-4%) which would make any level of scratching easier to identify/view." Therefore, on standard mirror a "Micro-scratch only affects surface with 4% reflection" but on Mirroview™ the same "Micro-scratch could result in contrast of up to 65% reflection."

ELECTRIC MIRROR'S TRIAL BRIEF  
2:16-CV-00665-RAJ

Page 9

Ellis | Li | McKinstry  
Market Place Tower  
2025 First Avenue, Penthouse A  
Seattle, WA 98121-3125  
206.682.0565  Fax: 206.625.1052

### E. Acceptance does not bar EM from rejecting latent deficiencies in Avalon's mirrors, which were not discovered by ordinary inspection.

"The buyer is justified in taking the seller at his word, and in relying upon the seller's statement rather than his own examination." *U.S. v. Franklin Steel Prod., Inc.*, 482, F.2d 400, 405 n.4 (9th Cir.) (quoting Williston, on Contracts § 793 at 500 (3d ed. 1964); *see General Electric Co. v. United States Dynamics, Inc.*, 403 F.2d 933 (1st Cir. 1968); *see Norton v. Lindsay*, 350 F.2d 46 (10th Cir. 1965); *see Union Pipe & Machinery v. Luria Steel & Trading Corp.*, 225 F.2d 829 (6th Cir. 1955). The 9th Circuit noted in *Franklin* that even if the government was contributorily negligent in failing to thoroughly examine the purchased goods, failure to inspect is not a defense to a breach of warranty claim. *See id.*, at 403.

### F. Electric Mirror properly notified Avalon upon discovering the defects attributable to Avalon.

RCW 62A.2-607(3)(a) states upon accepting tender, "The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach…"

The evidence will show, EM communicated with Avalon in August and September 2015 that it was having scratch issues with MirroView.

### G. Damages

Electric Mirror is entitled to direct, incidental and consequential damages arising from Avalon's breach.

> (1) Where the buyer has accepted goods and given notification, he or she may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

ELECTRIC MIRROR'S TRIAL BRIEF    Page 10
2:16-CV-00665-RAJ

Ellis | Li | McKinstry
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206.682.0565  Fax: 206.625.1052

> (3) In a proper case, any incidental and consequential damages under the next section may also be recovered.

RCW 62A.2-714.

> Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

RCW 62A.2-715(1)

Electric Mirror's damages resulting from Avalon's breach of warranty and contract fall into four general categories.

### 1. *Cost to rebuild 2009 custom lighted mirrors.*

Avalon's latent defects were responsible for approximately 2009 of the 2392 lighted mirrors rebuilt or repaired in Everett from September 2015 through March 2016. Electric Mirror's cost to rebuild included the following:

1. New MirroView mirrors Avalon manufactured and sold to EM for the rebuild;
2. EM's other costs reasonably necessary to complete the rebuild, such as labor, materials, and supplies.
3. EM's cost to ship rebuilt product from Everett to Las Vegas; and
4. EM's cost to remove and replace mirrors rejected for scratches in the hotel.

Avalon is liable to EM for the portion of EM's cost to rebuild reasonably attributable to the undisclosed latent defects in Avalon's mirrors.

### 2. *Cost to identify, segregate, and store lighted mirror from the first build rejected for scratches.*

Second, Avalon is liable to Electric Mirror for the costs EM incurred in Las Vegas to identify, segregate, store and retain lighted mirror rejected at the hotel or warehouse because of micro-scratches.

ELECTRIC MIRROR'S TRIAL BRIEF    Page 11
2:16-CV-00665-RAJ

Ellis | Li | McKinstry
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206.682.0565  Fax: 206.625.1052

### 3. *Refund for new mirrors that were unusable in the rebuild.*

From August 2015 through January 2016, Avalon sold EM 3334 mirrors for the rebuild. Of these, 446 were scratched or otherwise unusable upon receipt at EM and so EM rejected them as "Bad out of Box." EM timely notified Avalon of the rejections but paid for all of them to ensure it could complete the project. Avalon must refund all sums EM paid for unusable mirrors. RCW 62A.2-602.

### 4. *Lost opportunity / profit.*

EM's business, including its ability to pursue leads, close sales, and manufacture products already under order was disrupted from September 2015 through January 2016. Avalon must pay as damages, the sum of EM's lost business opportunity and profit reasonably attributed to Avalon's breach. Consequential damages resulting from the seller's breach include:

> any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> injury to person or property proximately resulting from any breach of warranty.

RCW 62A.2-715(2)(a)-(b).

"Lost profits are properly recoverable as damages when (1) they are within the contemplation of the parties at the time the contract was entered, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty." *Tiegs v. Watts*, 135 Wash.2d 1, 17-18 (1998). Mathematical certainty is not required.

> Lost profits are a recoverable element of damages to the extent the evidence permits their estimation with reasonable certainty. This court has stated:
>
> A measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty, is sometimes difficult to find. Plaintiff must produce the best evidence available and if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be

> denied a substantial recovery because the amount of the damage is incapable of exact ascertainment
>
> If a plaintiff has produced the best evidence available, and if the evidence affords a reasonable basis for estimating the loss, courts will not permit a wrongdoer to benefit from the difficulty of determining the dollar amount of loss.

*Lundgren v. Whitney's, Inc.*, 94 Wash.2d 91, 97-98 (1980) (internal citations omitted).

### III.   CONCLUSION

We look forward to the opportunity to more fully explore the evidence supporting Electric Mirror's claims in the weeks ahead.

Dated: November 6, 2018.

ELLIS, LI & McKINSTRY PLLC

By: *s/Kyle Netterfield*
Kyle D. Netterfield WSBA No. 27101
J. Connor Rankin WSBA No. 52514
2025 First Avenue PHA
Seattle, WA  98121
Telephone: (206) 682-0565
Fax: (206) 625-1052
Email:   knetterfield@elmlaw.com
              crankin@elmlaw.com

ELECTRIC MIRROR'S TRIAL BRIEF
2:16-CV-00665-RAJ
Page 13
Ellis | Li | McKinstry
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206.682.0565  Fax: 206.625.1052